Barry I. Levy, Esq.
Michael Sirignano, Esq.
Michael Vanunu, Esq.
Alexandra Wolff, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

               Plaintiffs,

       -against-

SURGUT LEASING CORP., RVA LEASING CORP.,
DRAK MEDICAL EQUIPMENT, INC., TANIYN
LEASING CORP., TATSU LEASING CORP., POLINA
RADYUSHINA, TATIANA MEJIA LINEROS, ZHONG
ZHOU, and JOHN DOE DEFENDANTS "1" through "10",

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- X

Docket No.:_____ (      )

**Plaintiff Demands a Trial by
Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO
General Insurance Company and GEICO Casualty Company (collectively "GEICO" or
"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

1.     GEICO brings this action to recover more than $210,000.00 that Defendants have
wrongfully obtained from GEICO and to terminate Defendants' on-going fraudulent scheme of

exploiting the New York "No-Fault" insurance system by submitting millions of dollars in charges relating to medically unnecessary, illusory, and otherwise non-reimbursable pieces of durable medical equipment ("DME"), including cold therapy units ("CTUs"), sustained acoustic medicine ("SAM") units, whirlpools, heat lamps, and TENS units (collectively, the "Fraudulent Equipment"), allegedly provided to New York automobile accident victims who were insured by GEICO ("Insureds"). As discussed in this complaint, the Fraudulent Equipment was provided and billed by Defendants without regard for genuine patient care, but rather, for the Defendants' financial benefit and as a result of unlawful financial arrangements between the Defendants and others.

2.     Defendants Surgut Leasing Corp. ("Surgut"), RVA Leasing Corp. ("RVA"), Drak Medical Equipment, Inc. ("Drak"), Taniyn Leasing Corp. ("Taniyn"), Tatsu Leasing Corp. ("Tatsu") (collectively, "Supplier Defendants") are retailers that purport to provide DME and are collectively owned by Polina Radyushina ("Radyushina"), Tatiana Mejia Lineros ("Lineros"), and Zhong Zhou ("Zhou")(collectively, the "Paper Owner Defendants")(collectively with the Supplier Defendants, the "Defendants").  The Paper Owner Defendants devised a scheme in conjunction with others not readily identifiable to GEICO to obtain prescriptions purportedly issued by various New York healthcare providers (the "Referring Providers") and then use the Supplier Defendants consecutively and in conjunction with each other to submit large volumes of billing to GEICO and other New York automobile insurance companies for purportedly providing Fraudulent Equipment, through the Supplier Defendants, that was medically unnecessary, illusory, and otherwise not reimbursable.

3.     Based upon the prescriptions for Fraudulent Equipment issued by the Referring Providers, the Supplier Defendants, the Paper Owner Defendants, and John Doe Defendants "1" –

"10" (the "John Doe Defendants")(collectively, the "Defendants") allegedly provided Fraudulent Equipment to individuals who claimed to have been involved in automobile accidents in New York and eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds").

4.      GEICO seeks to recover more than $210,000.00.00 that Defendants have wrongfully obtained from GEICO and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $1.7 million in pending No-Fault insurance claims that have been submitted on behalf of the Supplier Defendants because:

(i)      The Defendants billed GEICO for Fraudulent Equipment when they were ineligible to collect No-Fault Benefits because they failed to comply with local licensing requirements;

(ii)     The Defendants billed GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of unlawful financial arrangements with others who are not presently identifiable;

(iii)    The Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was prescribed and dispensed – to the extent that any Fraudulent Equipment was provided – pursuant to prescriptions issued by the Referring Providers as a result of predetermined fraudulent protocols designed to exploit Insureds for financial gain, without regard for genuine patient care;

(iv)    The Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent that any equipment was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions;

(v)     To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds; and

(vi)    To the extent that any equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently misrepresented that the charges were permissible and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

5.      The Defendants fall into the following categories:

(i)      The Supplier Defendants are New York corporations that purport to purchase DME from wholesalers, purport to provide Fraudulent Equipment to automobile accident victims, and bill New York automobile insurers, including GEICO, for providing Fraudulent Equipment.

(ii)     The Paper Owner Defendants are listed on paper as the owners, operators, and controllers of the Supplier Defendants when, as discussed below, they work for one of the John Doe Defendants who secretly controls and profits from each of the Supplier Defendants and used the Paper Owner Defendants to submit bills to GEICO and other New York automobile insurers for Fraudulent Equipment purportedly provided to automobile accident victims.

(iii)    The John Doe Defendants are citizens of New York and are presently not identifiable but: (i) secretly control and profit from the Supplier Defendants; (ii) associate with the Referring Providers and various multi-disciplinary medical offices that purportedly treat high-volume of No-Fault insurance patients (the "Clinics") and are the sources of prescriptions to the Supplier Defendants; and/or (iii) conspire with the Paper Owner Defendants to further the fraudulent schemes against GEICO and other automobile insurer.

6.      As discussed below, the Defendants have always known that the claims for the Fraudulent Equipment submitted to GEICO were fraudulent and not reimbursable because:

(i)      The bills for Fraudulent Equipment submitted by the Defendants to GEICO fraudulently misrepresented that the Defendants complied with all local licensing requirements when the Defendants were not lawfully licensed to provide the Fraudulent Equipment by the New York City Department of Consumer and Worker Protection (formerly Department of Consumer Affairs), as they misrepresented the ownership for each of the Supplier Defendants;

(ii)     The Fraudulent Equipment was provided – to the extent that any equipment was provided – based upon prescriptions received as a result of unlawful financial arrangements between the Defendants and others who are not presently identifiable and, thus, not eligible for no-fault insurance reimbursement in the first instance;

(iii)    The prescriptions for Fraudulent Equipment were not medically necessary and the Fraudulent Equipment was provided – to the extent that any equipment was provided – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants and others not presently known rather than to treat or otherwise benefit the Insureds;

(iv)    The Fraudulent Equipment was provided – to the extent that any equipment was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions;

(v)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the Defendants to GEICO – and other New York automobile insurers – fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to the Insureds as the HCPCS Codes identified in the bills did not accurately represent what was actually provided to Insureds; and

(vi)    To the extent that any equipment was provided to Insureds, the bills for Fraudulent Equipment the Defendants submitted to GEICO – and other New York automobile insurers – fraudulently mispresented that the charges were permissible and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

7.    As such, the Defendants do not how have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through the Supplier Defendants.

8.    The charts attached hereto as Exhibits "1" through "5" set forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to the Defendants' fraudulent scheme through the Supplier Defendants.

9.    The Defendants fraudulent scheme against GEICO and the New York automobile insurance industry began no later than July of 2019, and the scheme has continued uninterrupted since that time.

10.    As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $210,000.00.00.

## THE PARTIES

### I.    Plaintiffs

11.    Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska

corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

## II.    **Defendants**

12.    Defendant Surgut is a New York corporation with its principal place of business in New York, New York.   Surgut was incorporated on June 13, 2019, and is owned on and purportedly operated and controlled by Radyushina and Lineros. However, John Doe Defendant 1 was at all relevant times the true owner and the individual who secretly controls and profits from Surgut and, with the aid of Radyushina and Lineros, uses Surgut as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13.    Defendant RVA is a New York corporation with its principal place of business in Valley Stream, New York.   RVA was incorporated on July 22, 2021, and is owned on paper and purportedly operated and controlled by Radyusina. However, John Doe Defendant 1 was at all relevant times the true owner and the individual who secretly controls and profits from RVA and, with the aid of Radyushina, uses RVA as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

14.    Defendant Drak is a New York corporation with its principal place of business in Valley Stream, New York.   Drak was incorporated on December 22, 2020, and is owned on paper and purportedly operated and controlled by Radyushina and Lineros.   However, John Doe Defendant 1 was at all relevant times the true owner and the individual who secretly controls and profits from Drak and, with the aid of Radyushina and Lineros, uses Drak as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

15.    Defendant Taniyn is a New York corporation with its principal place of business in Valley Stream, New York.  Taniyn was incorporated on March 31, 2022, and is owned on paper and purportedly operated and controlled by Lineros. However, John Doe Defendant 1 was at all relevant times the true owner and the individual who secretly controls and profits from Taniyn and, with the aid of Lineros, uses Taniyn as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

16.    Defendant Tatsu is a New York corporation with its principal place of business in Valley Stream, New York.  Tatsu was incorporated on December 2, 2022, and is owned on paper and purportedly operated and controlled by Zhou. However, John Doe Defendant 1 was at all relevant times the true owner and the individual who secretly controls and profits from Tatsu and, with the aid of Zhou, uses Tatsu as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

17.    Defendant Radyushina resides in and is a citizen of New York.

18.    Defendant Lineros resides in and is a citizen of New York.

19.    Defendant Zhou resides in and is a citizen of New York.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

21.    Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

22.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

23.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the district where a substantial amount of the activities forming the basis

## ALLEGATIONS COMMON TO ALL CLAIMS

24.     GEICO underwrites automobile insurance in the State of New York.

## I.    An Overview of the Pertinent Laws

### A.    Pertinent Laws Governing No-Fault Insurance Reimbursement

25.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

26.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

27.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

28.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

29.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

30.    For instance, the implementing regulation adopted by the Superintendent of

Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section
> 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New
> York State or local licensing requirement necessary to perform such service in New
> York or meet <u>any</u> applicable licensing requirement necessary to perform such
> service in any other state in which such service is performed.

(Emphasis added).

31.    In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005), the New

York Court of Appeals confirmed that healthcare services providers that fail to comply with

licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look

beyond a facially-valid license to determine whether there was a failure to abide by state and local

law.

32.    Title 20 of the City of New York Administrative Code imposes licensing

requirements on healthcare providers located within the City of New York which engage in a

business which substantially involves the selling, renting, repairing, or adjusting of products for

the disabled, which includes DME.

33.    Specifically, New York City's Administrative Code requires DME suppliers to

obtain a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the

New York City Department of Consumer and Worker Protection ("DCWP") in order to lawfully

provide to the disabled, which is defined as "a person who has a physical or medical impairment

resulting from anatomical or physiological conditions which prevents the exercise of a normal

bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic

techniques". <u>See</u> 6 RCNY § 2-271; NYC Admin. Code §20-425.

34.     It is unlawful for any DME supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products License.  See NYC Admin. Code §20-426.

35.     A Dealer in Products License is obtained by filing a license application with the DCWP. The application requires that the applicant identify, among other pertinent information, all individuals who have a 10% or greater ownership interest in the applicant entity, and the commercial address of where the applicant is physically operating from.

36.     The license application for a Dealer in Products License also requires the applicant to affirm that they are authorized to complete and submit the application on behalf of the corporate entity seeking a license and that the information contained in the application is true, correct, and complete. The affirmation to the application requires a signature that is made under penalty for false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

37.     New York law also prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. See, e.g., N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

38.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

39.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as

"Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

40.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

41.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for commercial insurance or a statement of claim for any commercial or personal insurance benefits containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto . . ., commits a fraudulent insurance act, which is a crime.

42.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.     Pertinent Regulations Governing No-Fault Benefits for DME**

43.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

44.    DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, whirlpool baths, cryotherapy, continuous passive motion devices, cervical traction units, and devices to prevent deep vein thrombosis.

45.    To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME charges, the maximum charges that may be submitted by healthcare providers for DME are set forth in the New York Fee Schedule.

46.    In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

47.    For Supplier Defendants' charges submitted to GEICO with dates of service up through April 3, 2022, the New York Fee Schedule sets forth the maximum charges for DME as follows:

> (a)    The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:

(1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

(2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2 (2021).

48.     As indicated by the New York Fee Schedule, payment for DME is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

49.     According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

50.     For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning and assigning Healthcare Common Procedure Coding System ("HCPCS") Codes that should be used by DME companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

51.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto. Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

52.     Where a specific DME does not have a maximum reimbursement rate in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as

GEICO to the provider shall be the <u>lesser</u> of: (i) 150% of the acquisition cost to the provider; <u>or</u> (ii) the usual and customary price charged to the general public.

53.    For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." <u>See</u> New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

54.    To the extent that bills for No-Fault Benefits are for Non-Fee Schedule items and the HCPCS Codes are not within the Medicaid DME Procedure Codes, the definitions for set forth by Palmetto control to determine whether an item of DME qualify for reimbursement under a specific HCPCS Code.

55.    As it relates to charges for renting DME, for charges up to April 3, 2022, the New York Fee Schedule sets forth the maximum charges as follows:

> the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule.

<u>See</u> 12 N.Y.C.R.R. § 442.2(b) (2021).

56.    As indicated by the New York Fee Schedule, the total monthly rental cost for Fee-Schedule items shall not exceed the <u>lower</u> of: (i) the monthly rental charge to the general public; or (ii) the monthly fee permitted under the Medicaid Fee Schedule.

57.     Under the Medicaid Fee Schedule, the total monthly rental charges for equipment, supplies, and services, of Fee Schedule items is 10% of the maximum reimbursement amount.

58.     However, when DME is rented and charged to automobile insurers using HCPCS codes that are recognized by the Medicaid Fee Schedule but do not contain a maximum reimbursement amount then the maximum charge for a monthly rental is 10% of the acquisition cost for the DME, which includes all supplies that are provided with DME rental. See New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines, p. 16; Gov't Emps. Ins. Co. v. MII Supply LLC, Index No. 616953/18, Docket No. 43 (N.Y. Sup. Ct. Nassau Cty. December 4, 2019) (applying the 10% of acquisition cost rule for DME rentals for HCPCS Codes that are recognized by the Medicaid Fee Schedule but do not contain a reimbursement amount).

59.     For charges related to rental cost of Non-Fee Schedule items, the maximum monthly rental cost, as per the New York Fee Schedule, is the monthly cost to the general public because the New York State Department of Health has not established a price for DME rentals and defers as a matter of policy to the New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines.

60.     Additionally, DME suppliers are not entitled to separate charges for supplies and services provided in conjunction with the rental of DME.

61.     Regardless of whether DME is provided for patients to keep or rented to patients, the maximum reimbursement rates set forth above includes all shipping, handling, and delivery. See 12 N.Y.C.R.R. § 442.2(c) (2021). As such, DME suppliers are not entitled to submit separate charges for shipping, handling, delivery, or set up of any DME.

62.    In an effort to reduce the blatant fraud committed against insurers for abusive charges relating to DME, the New York State Workers' Compensation Board replaced the Medicaid Fee Schedule with the New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("WC DME Fee Schedule") that became effective on April 4, 2022.

63.    Among other things, the WC DME Fee Schedule limited the reimbursement rates of certain previously abused DME charges, such as charges for the rental of CPMs. The changes made for the reimbursement for DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. 442.2 (2022).

64.    Similarly, effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for DME that is not specifically identified by the WC DME Fee Schedule.

65.    However, between the time period of April 4, 2022, and May 31, 2023, to address the vagueness of determining the reimbursement of No-Fault for certain changes not identified in the WC DME Fee Schedule, the New York State Department of Financial Services issued an emergency amendment explaining the standard for reimbursement when there is no price contained in the WC DME Fee Schedule.

66.    For all charges after April 4, 2022, as it relates to Non-Fee Schedule items that are provided by a DME supplier, the maximum permissible reimbursement rate is the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public. See 11 N.Y.C.R.R. 68, Appendix 17-C, Part E.

67.     Relates to rental of DME with no reimbursement rate in the WC DME Fee Schedule, the emergency amendment sets forth that the maximum reimbursement amount for the total rental of DME to Insureds is the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

68.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)      The provider is in compliance with all significant statutory and regulatory requirements;

(ii)     The provider received a legitimate prescription for reasonable and medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;

(iii)    The prescription for DME is not based any unlawful financial arrangement;

(iv)     The DME identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(v)      The HCPCS Code identified in the bill actually represents the DME that was provided to the patient; and

(vi)     The fee sought for DME provided to an Insured was not in excess of the price contained in the DME Fee Schedule (Medicaid Fee Schedule or WC DME Fee Schedule) or the standard used for a Non-Fee Schedule item; or

(vii)    The *pro rata* monthly rental fee sought for renting DME to an Insured was not in excess of the standard for calculating rental reimbursement.

## II.    The Defendants' Fraudulent Scheme

### A.    The Supplier Defendants' Common Secret Ownership and An Overview of the Fraudulent Scheme

69.     Beginning in or about early 2020, the John Doe Defendants associated with the Paper Owner Defendants to implement a complex fraudulent scheme in which the Supplier Defendants were used by them concurrently and in conjunction with each other to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits to which they were never entitled to receive.

70.     While each of the Supplier Defendants were opened and listed as being owned by one of the Paper Owner Defendants, all the Supplier Defendants were actually owned and controlled by John Doe Defendant 1, who is not presently identifiable to GEICO (hereinafter, the "Secret Owner"), who also profited from the fraudulent scheme committed against GEICO and other New York automobile-insurers.

71.     The Secret Owner was able to secretly control and profit from the Supplier Defendants by using each of the Paper Owner Defendants as straw owners who would place their names on documents that needed to be filed with the State of New York and City of New York to lawfully operate the Supplier Defendants.

72.     For example, the Secret Owner listed different Paper Owner Defendants on incorporation paperwork and Dealer in Products License applications for each of the Supplier Defendants. Filing that paperwork permitted the Defendants to bill GEICO as purportedly legitimate DME/OD suppliers when, in fact, the Supplier Defendants existed solely as a means to submit fraudulent billing to GEICO and other New York automobile insurers.

73.     The fraudulent scheme specifically required the Paper Owner Defendants to be listed on the incorporation documents and on the Dealer in Products License applications to hide the Secret Owner's involvement in the Supplier Defendants.

74.     The Secret Owner took these steps to conceal the true ownership of each of the Supplier Defendants to give the illusion that each of the Supplier Defendants was a separate and distinct entity and conceal their involvement in a common fraudulent scheme.

75.     The fact that the Secret Owner actually owned the Supplier Defendants is illustrated by the inconsistencies/contradictions in the Supplier Defendants' paperwork filed with New York State, filed with the DCWP, and information provided in billing submissions to GEICO. For example:

(i)     As it relates to Surgut, Radyushina completed and signed Surgut's Dealer in Products License application, which indicated that Radyushina is the President and 100% owner of Surgut and is listed as the owner on the NF-3 billing forms submitted to GEICO. However, Lineros filed and signed a "Certificate of Change" on behalf of Surgut identifying herself as Surgut's President.

(ii)    As it relates to Drak, Radyushina completed and signed Drak's Dealer in Products License application, which indicated that Radyushina is the President and 100% owner of Drak and is listed as the owner on the NF-3 billing forms submitted to GEICO. However, when GEICO reached out to Drak to speak to the owner and someone about billing, GEICO was told to reach out to Lineros and was provided with Lineros's phone number.

(iii)   As it relates to Tatsu, the articles of incorporation filed with the New York State Department of Corporations indicates that Zhou is the owner, the Dealer in Products License application also indicates that Zhou is the owner, and Zhou is listed as the owner on the NF-3 billing forms submitted to GEICO. However, Lineros paid the fee to renew Tatsu's Dealer in Products License.

76.     In addition to the inconsistencies in the Supplier Defendants' paperwork with respect to ownership, GEICO's investigation identified other inconsistencies between the Paper Owner Defendants and their purported ownership of the Supplier Defendants.

77.     For example, during a clinic inspection of Drak, GEICO spoke to a woman named Lina Correa ("Correa") who identified "Tatiana" (Lineros) and provided them with Lineros's

phone number when asked about Drak's owner and billing manager. This is despite the fact that Drak is allegedly solely owned and controlled by Radyushina.

78.    Additionally, Lineros previously testified during an examination under oath of Taniyn that she does not and has never owned any DME company aside from Taniyn. Despite that, Lineros paid the Dealer in Products License renewal fee on behalf of Tatsu, which is allegedly exclusively owned by Zhou. Not coincidently, during a clinic inspection of an acupuncture provider, ZQZ Acupuncture, P.C. ("ZQZ Acupuncture"), which is also owned by Zhou, GEICO spoke to Lineros, who was identified as ZQZ Acupuncture's manager and Correa as its biller.

79.    Similarly, during a clinic inspection for Tatsu, GEICO spoke to Lineros, who on paper has no connection to Tatsu aside from paying for its Dealer in Products License, and she told them that Zhou was Tatsu's owner and Tatsu's orthotist is "Polina", likely referring to Radyushina.

80.    Such overlaps and inconsistencies between the Paper Owner Defendants and their allegedly separate and distinct DME companies demonstrates the lengths the Secret Owner went through to conceal their identity.

81.    In further keeping with the fact that the Secret Owner actually owned, controlled, and profited from the Supplier Defendants, and used the Paper Owner Defendants to further the fraudulent scheme herein, there is significant overlap in the operations of the Supplier Defendants that could only exist and be accomplished through the Secret Owner's involvement.

82.    For example, each of the five Supplier Defendants used the same accountant to file their articles of incorporation with the New York State Department of Corporations and the same collections law firm to handle billing submissions and collections proceedings as a result of their no-fault billing submissions to GEICO and other no-fault insurance carriers. Using one accountant

and one collections law firm allowed the Secret Owner to maintain control over the Supplier Defendants and the funds generated from them as part of the fraudulent scheme.

83.    As an additional example, the Supplier Defendants billed GEICO for purportedly providing Insureds with the same types of DME and OD, including using the same billing codes and similar rental rates, which as discussed below far exceeded the permissible reimbursement rates to which the Supplier Defendants were entitled.

84.    As another example, the Supplier Defendants used overlapping Referring Providers that operated from Clinics where the Defendants obtained prescriptions for DME, including: (1) Trishanna Yankannah, P.A.; (2) Ajin Mathew, P.A; (3) Tasheima Harrison, N.P.; (4) John McGee, D.O.; (5) Julie Saint Jean, N.P.; and (6) Charles Higuera, D.C.

85.    To maximize the amount of No-Fault Benefits the Defendants could receive while simultaneously attempting to avoid detection by GEICO, the Secret Owner along with the Paper Owner Defendants, used the Supplier Defendants to split up the billing that they were able to send to no-fault insurance carriers, including GEICO.

86.    Specifically, the Secret Owner opened Surgut on July 13, 2019, and used it to submit billing to GEICO for the Fraudulent Equipment until the early part of 2023. Once billing for Surgut was in full swing, the Secret Owner opened Drak on December 22, 2020, and continued to have the Paper Owner Defendants submit billing under Drak until October 2021. Several months before the Secret Owner stopped using Drak, they opened RVA on July 22, 2021 and continued billing GEICO through RVA until July 2023. Roughly nine months after forming RVA, the Secret Owner formed Taniyn on March 31, 2022 and continued to have the Paper Owner Defendants bill through Taniyn until July 2023. Roughly nine months after forming Taniyn, the Secret Owner

formed Tatsu on December 2, 2022 and used Tatsu simultaneously with Taniyn, billing through Tatsu from February 10, 2023 until October 2023.

87.    Through this method, the Defendants were able to submit more than $2.6 million in billing to GEICO alone for the Fraudulent Equipment while keeping billing to between $390,000.00 and $680,000.00 for each individual Supplier Defendant. As a result of the fraudulent scheme, the Defendants received more than $210,000.00.00 from GEICO.

88.    Another way that the Defendants were able to perpetrate the fraudulent scheme against GEICO was by obtaining prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers because of secret agreements with third-party individuals who are not presently identifiable.

89.    Once the Defendants received the prescriptions purportedly issued by the Referring Providers, the Defendants would submit NF-3 forms to GEICO seeking reimbursement for specific types of Fee Schedule and Non-Fee Schedule items with HCPCS Codes that were not directly identified in the prescriptions or that differed from the HCPCS Codes that were identified in the prescriptions.

90.    By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the Defendants indicated that they provided Insureds with the particular item associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a Referring Provider, who was licensed to prescribe DME and/or OD.

91.    However, the Defendants also tried to maximize the amount of No-Fault Benefits that they could obtain from GEICO by submitting bills to GEICO that misrepresented the

Fraudulent Equipment purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

92.      For example, the Defendants also engaged in a pattern of submitting bills to GEICO, and other automobile insurers, seeking No-Fault Benefits based on HCPCS Codes that did not accurately represent – sometimes in any way – the Fraudulent Equipment purportedly provided to the Insureds in order to obtain higher reimbursement rates than what was permissible.

93.      In furtherance of their scheme to defraud GEICO, and other automobile insurers, the Defendants also submitted bills for Non-Fee Schedule items that falsely indicated they were seeking reimbursement at the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public for the same item.

94.      In actuality, the bills from the Defendants submitted to GEICO for Non-Fee Schedule items contained grossly inflated reimbursement rates that did not accurately represent the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public.

95.      The Defendants submitted bills to GEICO, and other automobile insurers, seeking No-Fault Benefits for Fraudulent Equipment at rates that were grossly above the permissible reimbursement amount for Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits that they could receive.

96.      After obtaining the vague and generic prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers as a result of paying various forms of consideration, the Defendants would bill GEICO for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment that did not represent the HCPCS codes

contained in the bills to GEICO; (iv) Fraudulent Equipment at grossly inflated reimbursement rates; and (v) Fraudulent Equipment that was otherwise not reimbursable.

97.    Through the complex multi-corporation scheme, the Secret Owner and the Paper Owner Defendants used the Supplier Defendants to bill and collect No-Fault Benefits from GEICO and other automobile insurers that they were never entitled to collect.

98.    More specifically:

1.    Since March 2020, Surgut billed GEICO approximately $678,000.00, has wrongfully obtained more than $40,000.00 from GEICO, and there is more than $475,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Defendants continue to seek payment of from GEICO;

2.    Since February 2021, Drak billed GEICO approximately $396,000.00, has wrongfully obtained more than $128,000.00 from GEICO, and there is more than $139,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Defendants continue to seek payment of from GEICO;

3.    Since August 2021, RVA billed GEICO approximately $594,000.00, has wrongfully obtained more than $31,000.00 from GEICO, and there is more than $373,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Defendants continue to seek payment of from GEICO; and

4.    Since April 2022, Taniyn billed GEICO approximately $443,000.00 has wrongfully obtained more than $7,000.00 from GEICO, and there is more than $223,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Defendants continue to seek payment of from GEICO.

5.    Since April 2022, Tatsu billed GEICO approximately $580,000.00 has wrongfully obtained more than $4,000.00 from GEICO, and there is more than $527,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Defendants continue to seek payment of from GEICO.

**B.    Defendants Failure to Comply with Local Licensing Provisions**

99.    As stated above, for a DME/OD supplier to provide DME or OD to automobile accident victims within the City of New York, the DME/OD supplier must receive a Dealer in Products License from the DCWP.

100.    For the Defendants to lawfully provide Insureds with the DME/OD identified in Exhibits "1" through "5", the Supplier Defendants were required to obtain a Dealer in Products License because an overwhelming majority of the Insureds associated with the claims identified in Exhibits "1" through "5" were located within the City of New York.

101.    As part of the Defendants scheme to defraud GEICO and other Insurers, the Defendants sought Dealer in Products Licenses from the DCWP for the Supplier Defendants to create the appearance that they were legitimate.

102.    However, each of the Supplier Defendants were not eligible to collect No-Fault Benefits from GEICO, and other automobile insurers, because they were never lawfully licensed by the DCWP to provide DME or OD to Insureds.

103.    Specifically, none of the Supplier Defendants were lawfully licensed by the DCWP because they obtained Dealer in Products licenses under false pretenses.

104.    As part of obtaining a Dealer in Products License, each of the Supplier Defendants completed a license application form that required the Supplier Defendants to identify – among other things – each individual that owned more than 10% of the respective Supplier Defendant.

105.    Each Dealer in Products License contains an affirmation to be signed with a penalty for false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

106.    However, each of the Supplier Defendants lied in their application for a Dealer in Products License by falsely identifying all owners of each Supplier Defendant.

107.    For example, on January 14, 2020, Radyushina applied for a Dealer in Products License on behalf of Surgut and affirmed, under penalty for false statements, that she was the sole owner of Radyushina.

108.    However, as set forth above, Radyushina was only the paper owner of Surgut, and Surgut was actually owned and controlled by the Secret Owner, who is not presently identifiable to GEICO and directly profited from the fraudulent scheme committed through Surgut.

109.    On March 3, 2021, Radyushina applied for a Dealer in Products License on behalf of Drak and affirmed, under penalty for false statements, that she was the sole owner of Drak.

110.    In reality, as set forth above, Radyushina was only the paper owner of Drak, and Drak was actually controlled by the Secret Owner, who is not presently identifiable to GEICO and directly profited from the fraudulent scheme committed through Drak.

111.    On July 22, 2021, Radyushina applied for a Dealer in Products License on behalf of RVA and affirmed, under penalty for false statements, that she was the sole owner of RVA.

112.    However, as set forth above, Radyushina was only the paper owner of RVA, and RVA was actually owned and controlled by the Secret Owner, who is not presently identifiable to GEICO and directly profited from the fraudulent scheme committed through RVA.

113.    On April 5, 2022, Lineros applied for a Dealer in Products License on behalf of Taniyn and affirmed, under penalty for false statements, that she was the sole owner of Taniyn.

114.    In reality, as set forth above, Lineos was only the paper owner of Taniyn, and Taniyn was actually controlled by the Secret Owner, who is not presently identifiable to GEICO and directly profited from the fraudulent scheme committed through Taniyn.

115.    On February 6, 2023, Zhou applied for a Dealer in Products License on behalf of Tatsu and affirmed, under penalty for false statements, that he was the sole owner of Tatsu.

116.     In reality, as set forth above, Zhou was only the paper owner of Tatsu, and Tatsu was actually controlled by the Secret Owner, who is not presently identifiable to GEICO and directly profited from the fraudulent scheme committed through Tatsu.

117.     The Supplier Defendants never properly obtained Dealer in Products Licenses and were not lawfully permitted to sell, rent, fit, or adjust any DME or OD for Insureds within the City of New York.

118.     Accordingly, Defendants were never entitled to receive No-Fault Benefits because they failed to comply with all significant statutory and regulatory requirements by operating as a DME/OD supplier within the City of New York without a valid Dealer in Products License.

119.     In each of the claims identified in Exhibits "1" through "5" the Defendants fraudulently misrepresented that they were properly licensed with all local statutory and regulatory requirements and were lawfully permitted to provide DME/OD to Insureds when the Defendants were never eligible to collect No-Fault Benefits in the first instance because the Supplier Defendants did not lawfully obtain Dealer in Products Licenses.

**C.      The Defendants' Illegal Financial Arrangements**

120.     To obtain access to Insureds so the Defendants could implement and execute their fraudulent scheme and maximize the amount of No-Fault Benefits the Defendants could obtain from GEICO and other New York automobile insurers, the Defendants entered into unlawful financial agreements with others who are not presently identifiable (e.g., John Doe Defendants) where the Defendants paid financial consideration (i.e., kickbacks) in exchange for prescriptions for Fraudulent Equipment.

121.     Since the fraudulent scheme's inception, the Defendants have engaged in unlawful financial arrangements with others who are not presently identifiable in order to obtain

prescriptions for Fraudulent Equipment. These schemes allowed the Defendants to submit thousands of claims for Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

122.    As part of the unlawful financial arrangements, the Defendants would pay thousands of dollars in illegal kickback payments to others, including fictitious businesses, to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers.

123.    The Defendants were able to enter unlawful financial arrangement schemes with others who are not presently identifiable in order to obtain prescriptions purportedly issued by the Referring Providers because the Referring Providers operated at Clinics that are actually organized as "one-stop" shops for no-fault insurance fraud.

124.    These Clinics provide facilities for the Referring Providers, as well as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

125.    At each of the Clinics, unlicensed laypersons, rather than any healthcare professionals working at the Clinics, developed and controlled the patient base.  The Clinics willingly provided patient access to healthcare providers – and prescriptions to DME companies, like the Supplier Defendants, in exchange for kickbacks and other financial incentives because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and therefore catered to a high volume of Insureds at the locations.

126.    In keeping with the fact that the Defendants participated in unlawful kickbacks to obtain prescriptions for Fraudulent Equipment from Clinics, one of the Clinics that was a source of prescriptions for the Fraudulent Equipment has been the subject of a recent federal indictment

involving numerous individuals who allegedly paid monies to hospitals, medical providers and others for confidential patient information, and the patients would be contacted and "referred" for medical treatment from a select network of medical clinics (and lawyers) in New York and New Jersey that paid kickbacks to the indicted individuals. See United States of America v. Anthony Rose, et al., 19-cr-00789(PGG)(S.D.N.Y. 2019).

127.    In USA v. Rose, numerous individuals were indicted in November 2019 for paying bribes to 911 operators, medical personnel, NYPD officers, and others in exchange for confidential patient information. To exploit the patient information, Anthony Rose ("Rose"), the ringleader of the scheme, set up a fully staffed call center to contact the patients and to steer them to a preferred network of medical clinics (and lawyers) in New York and New Jersey.  Specifically, the medical clinics referenced were deemed preferred because the clinic controllers paid Rose kickbacks in exchange for the referrals.

128.    Recently, Government affidavits filed in support of surveillance warrants, including wiretaps, were unsealed in USA v. Rose. These affidavits detail the massive scope of the patient brokering scheme, reveal the identity of numerous layperson controllers and fraudulent clinic locations, and expressly implicate at least one Clinic where the Defendants obtained prescriptions for Fraudulent Equipment. See USA v. Rose, ECF No. 398.

129.    For example, the Clinic located at 135-25 79th Street, Brooklyn, NY ("79th Street Clinic") is one of the Clinics identified in USA v. Rose that was involved in the illegal kickback scheme. The 79th Street Clinic is also a source for prescriptions for Fraudulent Equipment that RVA used to submit billing to GEICO.

130.    Pursuant to the unlawful financial arrangements, the Defendants paid others who are not presently known, and who were able to direct prescriptions for Fraudulent Equipment

purportedly issued by the Referring Providers to the Defendants, which prescriptions the Defendants used to support their fraudulent bills to GEICO.

131.    For example, the Defendants, through the Supplier Defendants, collectively paid more than $110,000.00 to a company called CCCP Equipment, Inc. ("CCCP Equipment") which is a shell company owned and used by Arthur Gitlevich ("Gitlevich") to launder and/or funnel money in furtherance of no-fault insurance fraud schemes. Notably, Gitlevich, CCCP, and several other shell companies he owns were recently named in several lawsuits for their involvement in no-fault insurance fraud schemes. See Gov't Emps. Ins. Co. v. et al. v. Grody et al., 1:22-cv-06187-RER-PK; Gov't Emps. Ins. Co. et al. v. Poonawala et al., 1:22-cv-03063-PKC-VMS.

132.    In fact, when Gitlevich was deposed in Grody regarding CCCP Equipment, what services it purports to provide and why it was paid in relation to the no-fault insurance fraud scheme in Grody, Gitlevich repeatedly invoked his Fifth Amendment rights and refused to answer questions such as what CCCP Equipment does, whether CCCP Equipment serves any legitimate purpose, and whether CCCP Equipment was used to funnel and/or launder proceeds from a no-fault insurance fraud scheme.

133.    In support of the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements, as explained in detail below, the prescriptions were not medically necessary, were provided pursuant to predetermined fraudulent protocols that provided Insureds with predetermined sets of virtually identical Fraudulent Equipment, and frequently never actually issued by the Referring Provider.

134.    In also keeping with the fact that the Defendants obtained prescriptions for Fraudulent Equipment that were not medically unnecessary and were provided as a result of unlawful financial arrangements, the Defendants: (i) received virtually identical predetermined

sets of prescriptions from multiple Referring Providers operating out of the same Clinic; (ii) often received prescriptions for Fraudulent Equipment containing stamped signatures or photocopied prescriptions that were purportedly issued by but never actually signed, authorized, or otherwise issued by the Referring Providers; and (iii) obtained prescriptions for Fraudulent Equipment directly from the Clinics without any communication with or involvement by the Insureds.

135.    Furthermore, and to the extent that the Insureds received any Fraudulent Equipment, the Insureds were provided with Fraudulent Equipment directly from the Clinics without any interaction with the Defendants.

136.    In all of the claims identified in Exhibits "1" through "5" the Defendants falsely represented that Fraudulent Equipment was provided pursuant to lawful prescriptions from healthcare providers and were therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to unlawful financial arrangements.

### D.    The Prescriptions Obtained Pursuant to Predetermined Fraudulent Protocols

137.    In addition to the Defendants' unlawful financial arrangements, the Defendants obtained prescriptions pursuant to agreements with others who are not presently identifiable for Fraudulent Equipment issued as a result of predetermined fraudulent protocols in place at the Clinics. The protocols were designed to maximize the billing that the Defendants – and others – could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

138.    In the claims identified in Exhibits "1" through "5", virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

139.    Concomitantly, almost none of the Insureds identified in Exhibits "1" through "5", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

140.    In keeping with the fact that the Insureds identified in Exhibits "1" through "5" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

141.    To the extent that the Insureds in the claims identified in Exhibits "1" through "5" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then discharged with nothing more serious than a minor soft tissue injury such as a sprain or strain.

142.    However, despite the fact that virtually all of the Insureds were involved in relatively minor and low-impact accidents and only suffered from sprains and strains – to the extent the Insureds were actually injured – virtually all of the Insureds who treated with each of the Referring Providers were subject to extremely similar treatment, including nearly identical prescriptions for Fraudulent Equipment.

143.    The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibits "1" through "5" were issued pursuant to predetermined fraudulent protocols set forth at each Clinic, not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

144.    No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols described below.

145.     In general, the Defendants obtained prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers pursuant to the following predetermined fraudulent protocols:

(i)      an Insured would arrive at a Clinic for treatment subsequent to a motor vehicle accident;

(ii)     the Insured would be seen by a Referring Provider;

(iii)    on the date of the first visit, the Referring Provider would direct the Insured to undergo conservative treatment and purportedly provide a prescription for a set of DME and/or OD, generally for Fraudulent Equipment rentals for Surgut, RVA, Taniyn, and Tatsu or non-rental Fraudulent Equipment for Drak;

(iv)     subsequently, the Insured would return to the Clinic for one or more additional evaluations and treatment by other healthcare providers, and none of the examination notes would mention of the DME prescribed to the Insured; and

(v)      at least one, if not more than one, prescription for DME and/or OD would be directly provided to the Supplier Defendants to fill and was filled without any involvement by the Insured.

146.     Virtually all of the claims identified in Exhibits "1" through "5" are based upon medically unnecessary prescriptions for predetermined sets of Fraudulent Equipment, which were purportedly issued by the Referring Providers who practiced at various Clinics across the New York metropolitan area.

147.     In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patient's individual symptoms or presentation.

148.     Furthermore, in a legitimate setting, during the course of a patient's treatment, a healthcare provider <u>may</u> – but not always – prescribe DME and/or OD that should aid in the treatment of the patient's symptoms.

149.    In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

150.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident. For example, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

151.    If a healthcare provider determines that DME and/or OD is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would indicate in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD was prescribed and why any of the prescribed Fraudulent Equipment was medically necessary or how it would help the Insured.

152.    It is improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibits "1" through "5" who treated with different Referring Providers at different Clinics would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

153.    Here, and in keeping with the fact that the prescriptions provided to the Defendants were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibits "1" through "5" that treated at specific Clinics were issued extremely similar prescriptions for a predetermined set of Fraudulent Equipment.

154.    In keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" through "5" were issued pursuant to predetermined fraudulent protocols, and not for the benefit of the Insureds – as set forth below – the Referring Providers all issued similar checkmark-based prescriptions and routinely issued multiple checkmark-based prescriptions to a single patient on the same day when there was no legitimate reason to do so.

155.    In further keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to predetermined fraudulent protocols, to the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain – and oftentimes failed to identify – the Fraudulent Equipment identified on the prescriptions provided to the Defendants and used by the Defendants to bill GEICO for the charges identified in Exhibits "1" through "5".

156.    In further keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to the Insureds identified in Exhibits "1" through "5" were not medically necessary but were the result of predetermined fraudulent protocols, the prescriptions typically contained vague and generic descriptions for DME and OD, which – as explained in more detail below – provided the Defendants with the opportunity to purportedly provide – and bill GEICO for – whatever DME or OD they wanted.

157.    Further evidence of the lack of medical necessity for the Fraudulent Equipment is the fact and the Insureds often did not even receive the Fraudulent Equipment, to the extent they received any at all, from the Supplier Defendants for several weeks, sometimes even months, after the prescription was written.

158.    For example:

(i)    A prescription was issued to an Insured named LS purportedly by Kelvin Jack M.D. ("Jack") on March 8, 2022, however, RVA did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until June 14, 2022, 98 days later.

(ii)    A prescription was issued to an Insured named DR purportedly by Jack on March 8, 2022, however, RVA did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until June 14, 2022, 98 days later.

(iii)    A prescription was issued to an Insured named LM purportedly by Cathy Delerme-Pagan, M.D. ("Pagan") on August 18, 2022. However, Surgut did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until November 23, 2022, 97 days later.

(iv)    A prescription was issued to an Insured named RB purportedly by Glenn Whitney, D.C. ("Whitney") on July 26, 2022, however, Surgut did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until October 25, 2022, 91 days later.

(v)    A prescription was issued to an Insured named HD purportedly by John McGee, D.O. ("McGee") on September 9, 2022, however, Surgut did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until November 29, 2022, 81 days later.

(vi)    A prescription was issued to an Insured named LK purportedly by Tasheima Harrison, N.P. ("Harrison") on February 28, 2022, however, RVA did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until May 16, 2022, 77 days later.

(vii)    A prescription was issued to an Insured named PA purportedly by Archer Irby D.C. ("Irby") on April 5, 2021, however, Drak did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until June 1, 2021, 57 days later.

(viii)    A prescription was issued to an Insured named SAT purportedly by McGee on August 29, 2022, however, Surgut did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until November 1, 2022, 64 days later.

(ix)    A prescription was issued to an Insured named AS purportedly by Trishanna Yankannah ("Yankannah") on August 21, 2022, however, Taniyn did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until October 11, 2022, 51 days later.

(x)    A prescription was issued to an Insured named HT purportedly by Joseph Martone, P.A.-C ("Martone") on March 10, 2023, however, Tatsu did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until April 20, 2023, 41 days later.

159.    These are just representative examples.

160.    Additionally, and as explained below in more detail, the charges to GEICO identified in Exhibits "1" through "5" were not based upon prescriptions for medically necessary Fraudulent Equipment because the Defendants purportedly provided Insureds with whatever DME or OD that they wanted, even when the Fraudulent Equipment purportedly provided – and billed to GEICO – was not the item identified in the prescriptions purportedly issued by the Referring Providers.

161.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" through "5" were issued because of predetermined fraudulent protocols and not based upon medical necessity, the prescriptions purportedly issued by the Referring Providers were never given to the Insureds.

162.    Instead, upon information and belief, the Insureds were provided with Fraudulent Equipment directly from the Clinic's receptionists or delivered to their home without any choice of what DME provider would provide their equipment and with minimal interaction, if any, from the Defendants – to the extent that the Insureds actually received any Fraudulent Equipment.

163.    For the reasons set forth above, and below, in each of the claims identified  in Exhibits "1" through "5", the Defendants falsely represented that Fraudulent Equipment was provided pursuant to prescriptions from healthcare providers for medically necessary DME or OD, and where therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to the Defendants pursuant agreements with others who are not presently identifiable.

**E.    Predetermined Fraudulent Protocols Implemented at the Clinics**

164.    As with the listed owner of the Supplier Defendants, the Defendants attempted to diversify the Referring Providers from whom each of the Supplier Defendants received their prescriptions to give the appearance that each Supplier Defendant was separate and distinct.

165.    In order to do this, the Defendants conspired with individuals associated with the Clinics who are not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent Equipment pursuant to predetermined fraudulent protocols.

166.    After their involvement in minor "fender-bender" motor vehicle accidents, most of the Insureds identified in Exhibits "1" through "5" purportedly received treatment from a variety of healthcare professionals who operated out of the various Clinics.

167.    Virtually every Insured identified in Exhibits "1" through "5" who purportedly received Fraudulent Equipment was provided with an initial examination from a healthcare provider (i.e., a Referring Provider) at one the Clinics. After their purported initial examination, each of the Insureds was prescribed multiple items of Fraudulent Equipment.

168.    When the Insureds sought treatment with and were purportedly provided with an initial evaluation by healthcare providers at the Clinics, the Referring Providers did not evaluate

each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

169.    Rather, Referring Providers purportedly issued prescriptions for a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon a predetermined fraudulent protocol.

170.    In keeping with the fact that the prescriptions issued by the Referring Providers at the Clinics subsequent to purported initial examinations were not medically necessary and were provided pursuant to the predetermined fraudulent protocol, virtually every Insured who underwent an initial examination was issued a prescription for virtually the same type of Fraudulent Equipment, regardless of which Referring Provider purportedly issued the prescription.

171.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported initial examination, Referring Providers almost always prescribed the following Fraudulent Equipment to virtually all the Insureds identified in Exhibits "1" through "5" that they treated: (i) VascuTherm (e.g., CTU) and sustained acoustic medicine ("SAM") unit rentals, which prescriptions were given to Surgut, RVA, Taniyn. and/or Tatsu; and/or (ii) whirlpools, TENS units, heat lamps, and massagers, which prescriptions were given to Drak.

172.    In further keeping with the fact that the prescriptions issued to the Insureds by Referring Providers at the Clinics after purported initial examinations were not medically necessary and were issued pursuant to predetermined fraudulent protocols, the Supplier Defendants received prescriptions issued from several Referring Providers associated with Tri-Borough NY Medical Practice P.C. ("Tri-Borough"), Atlantic Medical & Diagnostic, P.C.

("Atlantic Medical"), and Macintosh Medical PC ("Macintosh Medical") at a variety of Clinics for substantially similar prescriptions for Fraudulent Equipment that did not appear to be based upon each patient's individual circumstance. Not coincidentally, Macinstosh Medical and Atlantic Medical are owned by the same individual, Jonathan Landow, M.D. ("Landow").

173.    Drak, Surgut, Tatsu, and Taniyn all received prescriptions from the following practitioners associated with Macintosh Medical: (i) Trishanna Yankannah P.A.; (ii) Mathew Ajin, P.A.; and (iii) Aleksandr Kopach, P.A.  Notably, Macintosh Medical and its owner – Landow – were sued by GEICO for engaging in a multimillion-dollar fraud scheme involving fraudulent billing and treatment protocols, including paying kickbacks to clinic controllers in exchange for access to no-fault patients who they could subject to a myriad of medically unnecessary healthcare services. See Gov't Emp. Ins. Co. et al. v. Landow, et al., 1:21-cv-01440-NGG-RER (E.D.N.Y. 2021).

174.    The following are several examples of Drak receiving prescriptions as a result of the predetermined protocols used by Tri-Borough and Macintosh Medical providers:

(i)     An Insured named DG was involved in an automobile accident on March 10, 2021. Afterwards, DG purportedly went to a clinic located at 2488 Grand Concourse, Bronx, NY ("Grand Concourse Clinic") and received treatment from Scott Lyons, P.A. ("Lyons") on behalf of Macintosh Medical, who purportedly issued prescriptions for Fraudulent Equipment, including the following: (1) TENS unit; (2) heat lamp; (3) whirlpool; and (4) massager.

(ii)    An Insured named DC was involved in an automobile accident on March 10, 2021. Afterwards, DC purportedly went to the Grand Concourse Clinic and received treatment from Lyons on behalf of Macintosh Medical, who purportedly issued prescriptions for Fraudulent Equipment, including the following: (1) TENS unit; (2) heat lamp; (3) whirlpool; and (4) massager.

(iii)   An Insured named LSR was involved in an automobile accident on April 5, 2021. Afterwards, LSR purportedly went to a clinic located at 3250 Westchester Avenue, Bronx, NY ("Westchester Ave Clinic") and received treatment from John Greco, M.D. ("Greco") on behalf of Tri-Borough,

who purportedly issued prescriptions for Fraudulent Equipment, including the following: (1) TENS unit; (2) heat lamp; and (3) whirlpool.

(iv)    An Insured named JV was involved in an automobile accident on April 5, 2021. Afterwards, JV purportedly went to a clinic located at 4250 White Plains Road, Bronx, NY ("White Plains Clinic") and received treatment from Aleksandr Kopach, P.A. ("Kopach") on behalf of Macintosh Medical, who purportedly issued prescriptions for Fraudulent Equipment, including the following: (1) TENS unit; (2) heat lamp; and (3) percussor.

(v)    An Insured named TT was involved in an automobile accident on April 7, 2021. Afterwards, TT purportedly went to the Westchester Ave Clinic and received treatment from Youn Ju Lee, N.P. ("Lee") on behalf of Tri-Borough, who purportedly issued prescriptions for Fraudulent Equipment, including the following: (1) TENS unit; (2) heat lamp; and (3) whirlpool.

(vi)    An Insured named RT was involved in an automobile accident on April 16, 2021. Afterwards, RT purportedly went to the Grand Concourse Clinic and received treatment from Suresh Paulus, D.O. ("Paulus") on behalf of Tri-Borough, who purportedly issued prescriptions for Fraudulent Equipment including the following: (1) TENS unit; (2) heat lamp; and (3) whirlpool.

(vii)    An Insured named LC was involved in an automobile accident on April 24, 2021. Afterwards, LC purportedly went to the Westchester Ave Clinic and received treatment from Olatokunbo Osewa-Lucas, N.P. ("Lucas") on behalf of Tri-Borough, who purportedly issued prescriptions for Fraudulent Equipment, including the following: (1) TENS unit; (2) heat lamp; and (3) whirlpool.

(viii)    An Insured named CR was involved in an automobile accident on April 28, 2021. Afterwards, CR purportedly went to the Grand Concourse Clinic and received treatment from Greco on behalf of Tri-Borough, who purportedly issued prescriptions for Fraudulent Equipment, including the following: (1) TENS unit; (2) heat lamp; and (3) whirlpool.

(ix)    An Insured named MC was involved in an automobile accident on May 2, 2021. Afterwards, MC purportedly went to the Grand Concourse Clinic and received treatment from Carlotta Ross-Distin, P.A. ("Distin") on behalf of Macintosh Medical, who purportedly issued prescriptions for Fraudulent Equipment, including the following: (1) TENS unit; (2) heat lamp; (3) whirlpool; and (4) percussor.

(x)    An Insured named JB was involved in an automobile accident on May 15, 2021. Afterwards, JB purportedly went a clinic located at 3626 Bailey Avenue, Bronx, NY ("Bailey Ave Clinic") and received treatment from Distin on behalf of Macintosh Medical, who purportedly issued

prescriptions for Fraudulent Equipment, including the following: (1) TENS unit; (2) heat lamp; (3) whirlpool; and (4) percussor.

175.    These are just representative examples.

176.    Similar to Drak, Surgut, RVA, Taniyn, and Tatsu received prescriptions pursuant to predetermined protocols from Tri-Borough and Macintosh Medical as well as Atlantic Medical providers operating from a series of different Clinics. For example:

(i)     An Insured named NT was involved in an automobile accident on January 21, 2022. Afterwards, NT purportedly went to a clinic located at 3041 Avenue U, Brooklyn, NY ("Ave U Clinic") and received treatment from Natalia Feldman, N.P. on behalf of Tri-Borough, who purportedly issued prescriptions for NT for the rental of Fraudulent Equipment, which was filled by RVA, including the following: a 28-day CTU rental.

(ii)    An Insured named NS was involved in an automobile accident on February 7, 2022. Afterwards, NS purportedly went to the Ave U Clinic and received treatment from Michael Alleyne, M.D. ("Alleyne") on behalf of Tri-Borough, who purportedly issued prescriptions for NS for the rental of Fraudulent Equipment, which was filled by RVA, including the following: a 28-day CTU rental.

(iii)   An Insured named GA was involved in an automobile accident on May 3, 2022. Afterwards, GA purportedly went a clinic located at 903 Sheridan Avenue, Bronx, NY ("Sheridan Clinic") and received treatment from Ajin Mathew, P.A. ("Mathew") on behalf of Macintosh Medical, who purportedly issued prescriptions for GA for the rental of Fraudulent Equipment, which was filled by Taniyn, including the following: a 28-day CTU rental.

(iv)    An Insured named AS was involved in an automobile accident on May 9, 2022. Afterwards, AS purportedly went to the Ave U Clinic and received treatment from Deonaire Rampershad, N.P. ("Rampershad") on behalf of Tri-Borough. On the same date, Gaetan Jean Marie, N.P. ("Jean Marie"), also associated with Tri-Borough purportedly issued prescriptions for AS for the rental of Fraudulent Equipment, which was filled by Surgut, including the following: a 28-day CTU rental, despite Jean Marie not treating AS on that day.

(v)     An Insured named SS was involved in an automobile accident on May 12, 2022. Afterwards, SS purportedly went to the Sheridan Clinic and received treatment from Mathew on behalf of Macintosh Medical, who purportedly

issued prescriptions for SS for the rental of Fraudulent Equipment, which was filled by RVA, including the following: a 28-day CTU rental.

(vi)    An Insured named BM was involved in an automobile accident on June 12, 2022. Afterwards, BM purportedly went to a clinic located at 665 Pelham Parkway, Bronx, NY ("Pelham Clinic") and received treatment from Trishanna Yankannah, N.P. ("Yankannah") on behalf of Atlantic Medical, who purportedly issued prescriptions for BM for the rental of Fraudulent Equipment, which was filled by Surgut, including the following: a 28-day CTU rental.

(vii)    An Insured named DY was involved in an automobile accident on June 16, 2022. Afterwards, DY purportedly went to the Sheridan Clinic and received treatment from Mathew on behalf of Macintosh Medical, who purportedly issued prescriptions for DY for the rental of Fraudulent Equipment, which was filled by Surgut, including the following: a 28-day CTU rental.

(viii)    An Insured named JM was involved in an automobile accident on September 9, 2022. Afterwards, JM purportedly went the Sheridan Clinic and received treatment from Mathew on behalf of Atlantic Medical, who purportedly issued prescriptions for JM for the rental of Fraudulent Equipment, which was filled by Taniyn, including the following: a 28-day CTU rental.

(ix)    An Insured named TF was involved in an automobile accident on February 14, 2023. Afterwards, TF purportedly went to a clinic located at 1120 Morris Park Avenue, Bronx, NY ("Morris Park Clinic") and received treatment from Mathew on behalf of Atlantic Medical, who purposedly issued prescriptions for TF for the rental of Fraudulent Equipment, which was filled by Tatsu, including the following: a 28-day CTU rental.

(x)    An Insured named BR was involved in an automobile accident on April 16, 2023. Afterwards, BR purportedly went to the Morris Park Clinic and received treatment from Mathew on behalf of Atlantic Medical, who purposedly issued prescriptions for BR for the rental of Fraudulent Equipment, which was filled by Tatsu, including the following: a 28-day CTU rental.

177.    These are just representative examples.

178.    Further, on multiple occasions, Insureds who were involved in the same automobile accident received the same Fraudulent Equipment from the Supplier Defendants on the same exact date, despite their different presentations and circumstances.

179.    For example:

(i)    On June 11, 2022, four Insureds, AD, EL, MJ, and ML were purportedly involved in the same automobile accident. Thereafter, all four sought treatment from the Pelham Clinic and were treated by Yankannah. While purporting to treat them, Yankannah wrote each of them prescriptions for 28-day CTU rentals, which were purportedly provided by Taniyn. In addition to those prescriptions, Yankannah wrote AD and MJ prescriptions for 6-week SAM unit rentals as well as ML and EL for 8-week SAM unit rentals, which were all also purportedly provided by Taniyn.

(ii)    On June 16, 2022, 11 Insureds, AR, EH, EL, JT, JC, MM, OL, SM, TM, WH, and YA were purportedly involved in the same automobile accident. Thereafter, six of the Insureds, AR, EH, EL, JT, TM, and WH sought treatment from a clinic located at 665 Pelham Parkway, Bronx, NY ("Pelham Clinic") and were treated by Yankannah. On June 21, 2022, five days after the accident, Yankannah wrote prescriptions for all six Insureds for 8-week SAM unit rentals and 28-day CTU rentals. Four of the six Insureds purportedly received the rentals from Surgut and the other two from Taniyn. The other five Insureds, SM, MM, JC, OL, and YA sought treatment from the Sheridan Clinic. While there, four of the Insureds were treated by Mathew and the last was treated by Joseph Borum, M.D. On June 22, 2022, six days after the accident, Mathew issued JC, OL, and YA prescriptions for 28-day CTU rentals and either 6 or 8-week SAM unit rentals. Surgut filled prescriptions for JC and YA while Taniyn filled the prescription for OL. Mathew also wrote SM a prescription for a 28-day CTU rental and Borum wrote MM a prescription for a 28-day CTU rental, which prescriptions were both purportedly filled by Surgut.

(iii)    On January 9, 2023, six Insureds, BR, BR, BG, EA, JR, and JD, were purportedly involved in the same automobile accident. Thereafter, all six sought treatment at the Sheridan Clinic and were purportedly treated by Michael Vargas, D.C. ("Vargas"). Vargas then purportedly issued prescriptions on behalf of all six patients. Five of the patients received prescriptions dated March 1, 2023 for a TENS unit, TENS placement belt, massager, and infrared heating lamp, which prescriptions were all purportedly filled by Drak on the same date. The sixth patient received a prescription for a cervical traction device and an LSO, which were also allegedly provided by Drak. In addition to that, four of the six patients, JR, BR, BR, and EA, also received prescriptions for rentals of SAM units and CTUs from Mathew dated January 11, 2023 from the Sheridan Clinic. Each of the SAM unit prescriptions was for an 8-week rental and each CTU prescription was for a 28-day rental. All of the rental prescriptions were allegedly filled by Taniyn.

(iv)    On January 9, 2023, three Insureds, AB, MV, and YR, were involved in the same automobile accident. Thereafter, all three sought treatment at the

Sheridan Clinic and were purportedly treated by Mathew. On June 1, 2022, Mathew wrote each prescriptions for 8-week SAM unit rentals and 28-day CTU rentals. All of the SAM unit rentals were purportedly provided by Taniyn and all of the CTU rentals were purportedly provided by RVA.

(v)     On June 10, 2023, two Insureds, AK and CK were purportedly involved in the same automobile accident. Thereafter, both AK and CK sought treatment at a clinic located at 1339 E. Gun Hill Road, Bronx, NY ("Gun Hill Road Clinic") and were treated by John McGee ("McGee"). On June 12, 2023, McGee wrote each prescriptions for 6-week SAM unit rentals and 28-day CTU rentals, which prescriptions were purportedly filled by Tatsu. Although not listed on any of the prescriptions for AK and CK, Tatsu also billed GEICO for LSO braces under HCPCS Code L0642 for both Insureds, referring to the braces as "back wraps" on the delivery receipt.

**F.     The Improper Distribution of Fraudulent Equipment to Insureds by the Defendants Without Prescriptions Identifying Medically Necessary DME**

180.    The Supplier Defendants are not licensed medical professional corporations. As such, the Defendants cannot properly dispense DME or OD to an Insured without a valid prescription from a licensed healthcare professional that definitively identifies medically necessary DME and/or OD to be provided.

181.    However, in many of the fraudulent claims identified in Exhibits "1". "2", "3", and "5", the Defendants improperly decided what DME and/or OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider - to the extent that they actually provided any DME and/or OD to the Insureds.

182.    More specifically, the prescriptions for OD purportedly issued by the Referring Providers and provided to the Defendants did not definitively identify medically necessary DME and/or OD to be provided to the Insureds. For example, the prescriptions did not: (i) provide a specific HCPCS Code for the DME and/or OD to be provided; or (ii) provide sufficient detail to direct the Defendants to a unique type of DME and/or OD.

183.    To the extent that some of the fraudulent claims identified in Exhibits "1". "2", "3", and "5" were based upon prescriptions that contained HCPCS Codes next to the descriptions of

DME and/or OD, the prescriptions were still vague as the HCPCS Code identified on the prescription did not correspond with the description next to the code. Accordingly, the Defendants used vague and generic prescriptions to improperly decide what DME and OD to provide Insureds.

184.    While the Referring Providers issued vague and generic prescriptions, the Defendants did not obtain any additional documentation from the Referring Providers to approve or otherwise acknowledge the specific types of DME and/or OD that was medically necessary for the Insureds.

185.    In fact, the Defendants purposefully failed to seek supporting documentation to clarify the type of DME and/or OD to provide Insureds solely for their own financial gain.

186.    Even more, in many of the fraudulent claims identified in Exhibits "1". "2", "3", and "5", the Defendants improperly provided DME to Insureds as the Fraudulent Equipment purportedly provided was not identified on the prescriptions used to support the charges to GEICO.

187.    For example, the Defendants routinely billed GEICO under HCPCS code E0730, which corresponds to TENS units when the prescriptions that the Defendants received for Insureds identified in Exhibit "3" identified an EMS unit, which is a separate device that has an extremely different function and different reimbursement rate than a TENS unit. An EMS unit is for muscle stimulation to promote muscle strength while a TENS unit is for nerve stimulation to assist with pain management.

188.    In a legitimate clinical setting, when a DME/OD Supplier would obtain a prescription that did not contain a HCPCS Code or a sufficient description to identify a specific item of DME and/or OD, the DME/OD Supplier would contact the referring healthcare provider to request clarification on the specific items that were being requested, including the features and requirements to dispense the appropriate DME and/or OD prescribed to each patient.

189.    As also part of a legitimate clinical setting, the DME/OD Supplier would have the referring healthcare provider sign documentation to confirm that the specific item of DME and/or OD – identified by HCPCS Code or a detailed description – was medically necessary for the patient.

190.    Upon information and belief, the Defendants never contacted Referring Providers to seek instructions and/or clarifications, but rather made their own determination as to which specific item of Fraudulent Equipment to purportedly provide to each Insured. Not surprisingly, the Defendants elected to provide the Insureds with Fraudulent Equipment that had a reimbursement rate on the higher-end of the permissible range under the Fee Schedule.

191.    For example, based upon vague and generic prescriptions for a "lumbosacral support", "LSO back support," or "LSO", the Defendants improperly decided what type of OD to provide Insureds – to the extent any items were actually provided.

192.    It is impossible for any unlicensed healthcare professional to determine, based solely upon the vague and generic descriptions for a "lumbosacral support", "LSO back support," or "LSO" what item is medically necessary for a specific Insured given that these descriptions directly relate to the over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, that can be dispensed to Insureds, including:

   (i)    HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated, and off-the-shelf, which has a maximum reimbursement rate of $43.27.

   (ii)   HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.

   (iii)  HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.

(iv)    HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated, and off-the-shelf, which has a maximum reimbursement rate of $65.92.

(v)    HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.

(vi)    HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.

(vii)    HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $806.64.

(viii)    HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $1,150.00.

(ix)    HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(x)    HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(xi)    HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(xii)    HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(xiii)    HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xiv)    HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(xv)    HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xvi)   HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xvii)   HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xviii) HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xix)   HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $111.80.

(xx)   HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xxi)   HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xxii)   HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xxiii) HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

193.   As unlicensed healthcare providers authorized to issue prescriptions, the Defendants were not legally permitted to determine which of the above-available options were best suited for each Insured based upon a vague prescription for a "lumbosacral support", "LSO back support", or "LSO".

194.   However, the Defendants never contacted the Referring Providers to clarify which of the twenty-three (23) options was medically necessary for each Insured, and instead decided themselves which specific type of Fraudulent Equipment they would bill GEICO for.

195.    In fact, each and every time that the Defendants received a prescription from the Referring Providers for a "lumbosacral support", "LSO back support", or "LSO" the Defendants billed GEICO using one of five HCPCS Codes, including L0627, L0631, L0632, L0637, or L0642, many of which are for custom-fitted braces, requesting reimbursement for between $280.00 and $1,150.00, and thereby asserted that they provided the Insureds with that specific item, which resulted in needlessly inflated charges to GEICO.

196.    Furthermore, virtually each and every time the Defendants received a prescription from the Referring Providers for a "LSO with APL control", the Defendants billed GEICO using HCPCS Code L0632, which is for a custom-fabricated device, requesting a reimbursement of $1,150.00 and thereby asserted that they provided the Insureds with that specific item, which resulted in needlessly inflated charges to GEICO. In fact, on at least one occasion, RVA billed under HCPCS Code L0632 when the prescription simply called for a "LSO Brace."

197.    These are only representative examples. To the extent that the Defendants actually provided the non-rental Fraudulent Equipment identified in Exhibits "1", "2", "3", and "5", they unlawfully prescribed it because the DME the Defendants provided was based on intentionally vague and generic prescriptions to allow the Defendants to decide which specific items of DME and/or OD to provide to the Insureds.

198.    The Fraudulent Equipment provided to the Insureds identified in Exhibits "1", "2", "3", and "5" –by the Defendants to the extent that the Fraudulent Equipment was actually provided – was not based on: (i) prescriptions by licensed healthcare providers containing sufficient detail to identify unique types DME and/or OD; or (ii) a determination by a licensed healthcare provider that the specific items dispensed to the Insureds were medically necessary. Rather, the Fraudulent Equipment was impermissibly based upon the decisions by the Defendants.

199.    In all of the claims identified in Exhibits "1", "2", "3", and "5" that were based upon vague and generic language contained in the prescriptions, the Defendants falsely represented that the Fraudulent Equipment purportedly provided to Insureds was based upon prescriptions for reasonable and medically necessary DME and/or OD issued by healthcare providers with lawful authority to do so. To the contrary, the Fraudulent Equipment was purportedly provided by the Defendants based on their own determination of what unique types of Fraudulent Equipment to purportedly provide, and, thus, was not eligible for reimbursement of No-Fault Benefits.

**G.    The Defendants' Fraudulent Billing as to Fraudulent Equipment**

200.    In furtherance of their scheme, and in an attempt to maximize the amount of the No-Fault Benefits they could obtain from automobile insurers, including GEICO, the Defendants made several fraudulent misrepresentations in each of the bills submitted by Supplier Defendants to GEICO.

201.    The bills for Fraudulent Equipment fraudulently misrepresented they were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely as part of unlawful financial arrangements between the Defendants and others who are not presently known.

202.    Similarly, the bills for Fraudulent Equipment submitted by the Defendants to GEICO and other New York automobile insurers fraudulently misrepresented they were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – based upon predetermined fraudulent protocols between the Defendants and others who are not presently known.

203.    Further, the bills for Fraudulent Equipment submitted by the Defendants to GEICO and other New York automobile insurers contained charges for DME, rental DME, delivery/set-

up fees, and accessories that fraudulently misrepresented the items were eligible for reimbursement of No-Fault Benefits, when they were not.

204.    Additionally, the bills for Fraudulent Equipment submitted by the Defendants to GEICO and other New York automobile insurers fraudulently mispresented the permissible reimbursement amounts the Supplier Defendants were entitled to for DME purportedly provided to Insureds.

205.    Moreover, and as explained below, the bills submitted to GEICO by the Defendants misrepresented, to the extent that any Fraudulent Equipment was provided: (i) the Fee Schedule items matched the HCPCS Codes identified in the bills to GEICO, when in fact they did not; and (ii) the charges for Non-Fee Schedule items were for permissible reimbursement rates, when they were not.

206.    Thereafter, in an attempt to further maximize their billing to GEICO for DME purportedly provided to GEICO's Insureds, the Defendants frequently submitted charges stemming from prescriptions issued on the same date of services in separate bills to GEICO.  The Defendants split up the bills to give the appearance of lower reimbursement rates in an effort to avoid detection by GEICO.

207.    For example, the Defendants routinely submitted one bill to GEICO for SAM unit rentals often totaling approximately $938.00 and a second bill for the CTU rentals often totaling approximately $1,620.00 despite the fact that the corresponding prescriptions were issued for an Insured on the same date and the Fraudulent Equipment was delivered together.

208.    When the Defendants submitted bills to GEICO seeking payment for Fraudulent Equipment, each of the bills contained HCPCS codes that were used to describe the type of Fraudulent Equipment purportedly provided to the Insureds.

209.     As indicated above, the New York Fee Schedule provides that the Medicaid Fee Schedule is used to determine the amount to pay for Fee Schedule items. The Medicaid Fee Schedule specifically defines the requirements for each HCPCS code used to bill for DME.

210.     Additionally, Palmetto provides specific characteristics and requirements that DME must meet in order to qualify for reimbursement under a specific HCPCS code for both Fee Schedule items and Non-Fee Schedule items.

211.     By submitting bills to GEICO containing specific HCPCS Codes the Defendants represented that Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

212.     However, in virtually all of the bills submitted to GEICO for Fee Schedule items the Defendants fraudulently represented to GEICO that the HCPCS Codes were accurate and appropriate for the Fee Schedule items purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

213.     Despite billing for Fee Schedule items using HCPCS Codes that had higher than necessary reimbursement amounts, to the extent that the Defendants provided any Fraudulent Equipment, the HCPCS codes in the bills submitted to GEICO severely misrepresented the type of Fee Schedule items purportedly provided to the Insureds.

i.     **Inflated Charges for the Rented Fraudulent Equipment**

214.     As stated above, the New York Fee Schedule sets forth a maximum permissible rental charge, on a monthly basis, for renting equipment, supplies and services. For Fee Schedule items, the total monthly rental charges for equipment, supplies, and services, is no greater than 10% of the listed maximum reimbursement amount or 10% of the DME supplier's actual acquisition cost. For Non-Fee Schedule items, which includes the Fraudulent Equipment, the total

monthly rental charges for equipment, supplies, and services is no greater than the average monthly cost to the general public.

215.    Additionally, DME suppliers are not entitled to separate charges for supplies and services provided in conjunction with the rental of DME.

216.    Regardless of whether DME is provided for patients to keep or rented to patients, the maximum reimbursement rates set forth above includes all shipping, handling, and delivery. See 12 N.Y.C.R.R. § 442.2(c). As such, DME suppliers are not entitled to submit separate charges for shipping, handling, delivery, or set up of any DME.

217.    When the Defendants submitted bills to GEICO seeking payment for the Fraudulent Equipment, each of the charges identified HCPCS codes that were used to describe the items purportedly rented or provided to the Insureds.

218.    When the Defendants submitted bills to GEICO seeking payment for renting Fraudulent Equipment, which included SAM units billed under HCPCS Code E1399 and CTUs billed under HCPCS Codes E0217 and E1399, the Defendants fraudulently misrepresented that the charges were no greater than the maximum permissible amount.

219.    For example, and as set forth in Exhibits "1", "2", "4", and "5" when the Defendants submitted bills to GEICO using HCPCS Code E1399 for purportedly renting SAM units to Insureds – to the extent the DME was actually provided to Insureds – the Defendants fraudulently misrepresented that they were able to collect between $67.00 and $69.00 per day for each SAM unit rented to an Insured.

220.    However, each of the charges submitted by the Defendants for SAM units under HCPCS Code E1399 fraudulently misrepresented the maximum reimbursement amount for the

rental of these SAM units as the maximum reimbursement rate was only a fraction of what was charged to GEICO.

221.    When submitting billing under HCPCS Code E1399, the Defendants were required to submit documentation supporting their charges to GEICO, such as an invoice that details the unit cost of the SAM unit, to verify the rate charged to GEICO and other automobile insurers.

222.    However, the Defendants never submitted any documentation to substantiate their charges billed under HCPCS Code E1399.

223.    Upon information and belief, the Defendants never submitted any documentation to substantiate their charges for SAM units billed under HCPCS Code E1399 because there was no documentation that could support the daily rental rates charged by the Defendants for SAM unit rentals billed under HCPCS Code E1399.

224.    Whatever documentation the Defendants possessed regarding their purchase of SAM units would indicate they were entitled to a daily rental rate substantially less than the $67.00 or $69.00 per day charged to GEICO.

225.    For example, GEICO is aware of other DME providers who purchased SAM units at a per-unit cost of $2,325.00, which equates to a maximum monthly rental charge of $232.50, or a maximum daily rental charge of $7.75, in contrast to the Defendants' charges to GEICO of $67.00 and $69.00 per day.

226.    In virtually all of the charges submitted to GEICO for the rental of SAM units under HCPCS Code E1399, the Defendants fraudulently misrepresented that the maximum reimbursement rate was $67.00 and $69.00 per day when their maximum reimbursement was substantially less.

227.    As an additional example, and as set forth in Exhibits "1", "2", "4" and "5" each time the Defendants submitted a bill to GEICO for renting a CTU using HCPCS Codes E1399 and E0215 and E0217 the Defendants fraudulently misrepresented that they were able to collect between $75.00 and $78.00 per day for each device provided to an Insured.

228.    However, each of the charges submitted by the Defendants for CTUs fraudulently misrepresented the maximum reimbursement amount for the rental of these devices, which was only a fraction of what was charged to GEICO.

229.    When the Defendants billed for a CTU, it was for purportedly renting a VascuTherm – made by ThermoTek – to the Insured.

230.    The Defendants purportedly claimed to GEICO that they purchased VascuTherm's from ThermoTek. Taniyn claims to have purchased each of its units for $2,799.00 per unit.

231.    With an acquisition cost of $2,799.00 per unit, the maximum rental reimbursement that the Defendants could bill GEICO was $279.00 for a full-month rental, or $9.30 per day.

232.    In virtually all the charges submitted to GEICO for the rental of CTUs, the Defendants fraudulently misrepresented that the maximum reimbursement charge was between $75.00 and $78.00 per day when the maximum reimbursement charge per month was no greater than one-tenth of Supplier Defendants' acquisition cost, which, upon information and belief, was the equivalent of $9.33 per day.

233.    In keeping with the fact that the rates of $75.00 and $78.00 per day by the Defendants for CTUs was grossly above the maximum allowable reimbursement, during GEICO's investigation into the Defendants, GEICO was able to find rental prices to the general public for VascuTherm devices via the internet at: (i) sosmedical.net for $595.00 for four weeks, which is

the equivalent of $21.25 per day; and (ii) medcomgroup.com for $675.00 for four weeks, which is the equivalent of $24.10 per day.

234.    Accordingly, in each of the claims identified within Exhibits "1", "2", "4", and "5" the Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges for the Fraudulent Equipment were less than or equal to the maximum reimbursement amount for each item. Instead, the Defendants purposefully billed GEICO at rates above the maximum reimbursement amounts in order to maximize the amount of No-Fault Benefits they could obtain from GEICO, and, thus, were not eligible for reimbursement of No-Fault Benefits.

### ii.    Charges for Non-Reimbursable Fraudulent Equipment

235.    The Defendants fraudulently misrepresented that they were entitled to collect charges related to (i) accessories for the Fraudulent Equipment and (ii) delivering/setting up the Fraudulent Equipment.

236.    For many of the charges identified in Exhibits "1", "2", "4", and "5", the Defendants submitted charges to GEICO for Fraudulent Equipment that were not reimbursable.

237.    Every time the Defendants billed GEICO using HCPCS Code E1399 for purportedly providing Insureds with a CTU, the Defendants also billed GEICO for one or more additional charges, under HCPCS Code A9900 for cervical wraps, HCPCS Code E0666 for leg wraps, and/or HCPCS Code E0655 for shoulder wraps.

238.    Wraps purportedly provided to Insureds was a necessary piece of equipment needed for the use of the CTUs, to the extent that the wrap was actually provided to Insured.

239.    The reimbursement rate to a DME supplier for renting DME to an Insured under HCPCS Code E1399 includes not just the DME unit, but also all equipment necessary for the device to work.

240.    DME suppliers, such as the Supplier Defendants, are not eligible to collect No-Fault Benefits for equipment that is a necessary component of DME that is contemporaneously provided.

241.    As such, the Defendants were not entitled to receive any No-Fault Benefits for charges related to the wraps because the calculation of reimbursement for renting CTUs to Insureds under E1399 included all necessary equipment, such as the wraps and patches.

242.    Accordingly, each charge the Defendants submitted to GEICO using HCPCS Codes A9900, E0666, and E0655 fraudulently misrepresented that they were entitled to No-Fault Benefits for wraps provided with the CTU when the Defendants were never entitled to such benefits.

243.    The Defendants also fraudulently misrepresented in the bills submitted to GEICO that they were entitled to No-Fault Benefits for delivery charges of the Fraudulent Equipment purportedly provided to the Insureds identified in Exhibits "1", "2", "4", and "5".

244.    Almost every time the Defendants purportedly provided the Insureds identified in Exhibits 1", "2", "4", and "5" with Fraudulent Equipment rentals, the Defendants submitted an additional charge to GEICO for between $150.00 and $165.00, using HCPCS Code A9901, for "DME delivery and set up." In total, the Defendants billed GEICO more than $55,000.00 for delivery and set up alone.

245.    Under the No-Fault Laws, the reimbursement rates for providing or renting DME includes all shipping, handling, and delivery. See 12 N.Y.C.R.R. § 442.2(c).

246.    Accordingly, the Defendants were never entitled to submit separate charges for shipping, handling, or delivery of the Fraudulent Equipment.

247. The Defendants submitted charges to GEICO and other automobile insurers for set up and delivery, using HCPCS Code A9901, in order to maximize the amount of No-Fault Benefits that they could receive.

248. In each of the claims identified within Exhibits "1", "2", "4", and "5" for "DME delivery and set up", under HCPCS Code A9901, the Defendants fraudulently misrepresented in the bills submitted to GEICO that those charges were reimbursable when the Defendants were never eligible to collect No-Fault Benefits for those charges in the first instance.

### iii.    Inflated Charges for the Non-Rental Fraudulent Equipment

249. In addition to SAM units and CTUs, the Defendants billed GEICO for other Fee Schedule and Non-Fee Schedule items purportedly provided to Insureds, including cervical traction devices, orthotic braces, NMES units, and orthopedic car seats, as part of the Defendants' predetermined treatment protocol.

250. In virtually all of the bills submitted to GEICO for Fee Schedule items, the Defendants fraudulently represented to GEICO that the HCPCS Codes were accurate and appropriate for the Fee Schedule items purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

251. Despite this representation, the Defendants always provided different DME from those referenced by HCPCS Code, to the extent that any DME was provided.

252. For example, when the Defendants billed GEICO using HCPCS Code T5001, they represented that they provided a positioning seat for persons with special orthopedic needs whose postural needs cannot be safely met by less costly alternatives such as the vehicle's restraint system or other restraint systems, and the person cannot use a standard/commercially available car seat. The following picture represents the type of car seat contemplated by HCPCS Code T5001.



253.    However, the "orthopedic car seats" purportedly provided to the Insureds – to the extent that any items were provided – qualified as positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190, defined as a "positioning cushion/pillow/wedge, any shape or size, includes all components and accessories." HCPCS Code E0190 has a maximum reimbursement rate of $22.04 per unit, which is only a fraction of the $600.00 the Defendants billed GEICO under HCPCS Code T5001.

254.    The Defendants also frequently billed under HCPCS Code E2611 in response to a prescription a prescription for a "lumbar cushion" or "lumber cushion". However, the product represented by HCPCS Code E2611 is defined as a general use wheelchair cushion with a width of less than 22 inches.

255.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E2611, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item in response to the prescriptions for a lumbar cushion or lumber cushion – were not cushions for use with a wheelchair.

256.     To the extent that any items were actually provided to the Insureds for the charges identified in Exhibits "1" and "3" under HCPCS Code E2611, the items were positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190.

257.     Similar to the fraudulent charges for the orthopedic car seats, the Defendants billed GEICO for $282.40 for each lumbar cushion billed under HCPCS Code E2611 as opposed to the $22.04 they were entitled to under HCPCS Code E0190 in order to maximize their profits.

258.     As an additional example, the Defendants regularly submitted charges of $155.52 for the claims identified in Exhibits "1" and "3" under HCPCS Code E0272 based on prescriptions for an "egg crate mattress". However, the product represented by HCPCS Code E0272 is defined as a foam rubber mattress, which is an actual mattress, not a mattress pad.

259.     Upon information and belief, to the extent that the Defendants provided the Insureds with any item – it was not a foam or rubber mattress as required by HCPCS Code E0272.

260.     Instead, to the extent that any items were provided, they were mattress pads/toppers in the shape of egg crates, not an actual mattress. Mattress pads are Fee Schedule items listed under HCPCS Code L0199, which sets a maximum reimbursement rate of $19.48.

261.     In addition to misrepresenting the items provided to Insureds, the Defendants also routinely misrepresented the permissible reimbursement rates for Non-Fee Schedule items billed to GEICO.

262.     For example, the Defendants billed GEICO for hundreds of infrared heat lamps under HCPCS Code E0205 with charges between $156.00 and $225.45 per unit, falsely representing those fees as a permissible reimbursement amounts for the Non-Fee Schedule item.

263.    Upon information and belief, to the extent that any items were provided, the infrared lamps were low quality items, and the permissible reimbursement rate was significantly less than the $156.00 charged by the Defendants.

264.    Similarly, Drak billed GEICO for massagers under HCPCS Code E1399 with charges between $164.00 per unit, falsely representing those fees as permissible reimbursement amounts for the Non-Fee Schedule item.

265.    Upon information and belief, to the extent that any items were provided, the massagers were low quality items, and the permissible reimbursement rate was significantly less than the $164.00 charged by the Defendants.

266.    The Defendants also billed GEICO for hundreds of bed boards under HCPCS Code E0274 with a charge of $101.85 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

267.    Upon information and belief, to the extent that any items were provided, the bed boards were low quality cardboard items, and the permissible reimbursement rate was significantly less than the $101.85 charged by the Defendants.

268.    In each of the claims identified within Exhibits "1", "2", "3", and "5" the Defendants fraudulently misrepresented in the bills submitted to GEICO for Fraudulent Equipment were for permissible reimbursement amounts when they fraudulent misrepresented what was provided and/or significantly inflated the permissible reimbursement rates for the Fraudulent Equipment, and therefore were not eligible to collect No-Fault Benefits in the first instance.

## III.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

269.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and/or treatment reports to

GEICO through and in the names of the Supplier Defendants, seeking payment for Fraudulent Equipment.

270.    The NF-3 forms, HCFA-1500 forms and treatment reports that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

    (i)    The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of Fraudulent Equipment, they were not properly licensed by the DCWP as they falsified the information contained in their application for a Dealer for Products License.

    (ii)    The NF-3 forms, HCFA-1500 forms, and prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with others who are not presently identifiable; (b) predetermined fraudulent protocols without regard for the medical necessity of the items; and (c) decisions made by laypersons not based upon lawful prescriptions from licensed healthcare providers for medically necessary items.

    (iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

    (iv)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO the reimbursement amount for the Non-Fee Schedule items provided to the Insureds, to the extent that the Defendants

provided any Fraudulent Equipment, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – falsified the permissible reimbursement amounts for Fraudulent Equipment identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

IV.    **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

271.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

272.    To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

273.    Specifically, they knowingly misrepresented that they were lawfully licensed by the City of New York as they never complied with regulations requiring the Supplier Defendants to obtain a Dealer in Products License from the DCWP because they falsely indicated, under penalty for false statements, in the application for a Dealer in Products License the common ownership by the Paper Owner Defendants for each of the Supplier Defendants, and concealed these misrepresentation in order to submit bills to GEICO and prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

274.    The Defendants also knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were – not based upon medical necessity but – the result of unlawful financial arrangements, were provided to the Defendants, and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

275.    Additionally, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment provided to the Defendants were – not based upon medical

necessity but – based upon predetermined fraudulent protocols and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

276.    Furthermore, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons who did not have the legal authority to issue medically necessary DME/OD, and not by an actual healthcare provider's prescription for medically necessary DME/OD, in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

277.    Even more, the Defendants knowingly misrepresented and concealed that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment provided to the Insureds in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

278.    Lastly, the Defendants knowingly misrepresented the permissible reimbursement amount of the Non-Fee Schedule items contained in the bills submitted by the Defendants to GEICO and did not include any invoices to support the charges in order to prevent GEICO from discovering that Non-Fee Schedule items were billed to GEICO for financial gain.

279.    Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification, including but not limited to, examinations under oath to determine whether the charges submitted through the Defendants were legitimate.

280.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation and arbitration against GEICO and other insurers if the charges were not promptly paid in full.

281.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to, and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $210,000.00 based upon the fraudulent charges representing payments made by GEICO to the Supplier Defendants.

282.    Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against the Supplier Defendants**
**(Surgut, RVA, Drak, Taniyn, and Tatsu)**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

283.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

284.    There is an actual case in controversy between GEICO and the Supplier Defendants regarding more than $1.7 million in fraudulent billing that has been submitted to GEICO in the name of the Supplier Defendants.

285.    The Supplier Defendants have no right to receive payment for any pending bills submitted to GEICO because the Supplier Defendants did not comply with all local licensing laws as the Supplier Defendants falsified the identifies of the corporate owners on the applications for

Dealer in Products Licenses, and thus, were not properly lawfully licensed by the DCWP as required by regulations from the City of New York.

286.    The Supplier Defendants also have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based – not upon medical necessity but – as a result of their participation in unlawful financial arrangements.

287.    The Supplier Defendants have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO were based – not upon medical necessity but – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants and others who are not presently known, rather than to treat the Insureds.

288.    The Supplier Defendants have no right to receive payment for any pending bills submitted to GEICO because the Supplier Defendants purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

289.    The Supplier Defendants have no right to receive payment for any pending bills submitted to GEICO because – to the extent the Supplier Defendants actually provided any Fraudulent Equipment – the Supplier Defendants fraudulently misrepresented the Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fee Schedule items provided to the Insureds.

290.    The Supplier Defendants have no right to receive payment for any pending bills submitted to GEICO because – to the extent the Supplier Defendants provided any Fraudulent Equipment – the Supplier Defendants fraudulently misrepresented that the charges for Non-Fee

Schedule items contained within the bills to GEICO were less than or equal to the maximum permissible reimbursement amount.

291.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Supplier Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of Surgut, RVA, Drak, Taniyn, and Tatsu.

**SECOND CAUSE OF ACTION**
**Against the Paper Owner Defendants (Radyushina, Lineros, and Zhou)**
**and the John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

292.    GEICO incorporates, as though fully set forth herein, each and every allegation in this Complaint as if fully set forth at length herein.

293.    Surgut, RVA, Drak, Taniyn, and Tatsu together constitute an association-in-fact "enterprise" (the "Supplier Defendant Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

294.    The members of the Supplier Defendant Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Surgut, RVA, Drak, Taniyn, and Tatsu are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

295.    The Supplier Defendant Enterprise operated under seven names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual tax identification number, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one

business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Supplier Defendant Enterprise acting singly or without the aid of each other.

296.    The Supplier Defendant Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

297.    The Paper Owner Defendants and the John Doe Defendant "1" have each been employed by and/or associated with the Supplier Defendant Enterprise.

298.    The Paper Owner Defendants and the John Doe Defendant "1" knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Supplier Defendant Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the Supplier Defendant Enterprise was not eligible to receive under the No-Fault Laws because: (i) in every claim, the Supplier Defendants were not properly licensed as required by regulations from the City of New York because they knowingly falsified information on their applications for a Dealer in Products license or never obtained a Dealer in Products license; (ii) in every claim, the Supplier

Defendants submitted bills to GEICO for DME/OD they purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (iii) in every claim, the Supplier Defendants submitted bills to GEICO for DME/OD they purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity; (iv) in many claims, to the extent that the Supplier Defendants actually provided DME/OD to Insureds, the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that the Supplier Defendants actually provided DME/OD to Insureds, the Fraudulent Equipment misrepresented the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment misrepresented the permissible reimbursement rate for the DME/OD provided. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" through "5".

299.    The Supplier Defendant Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in the Paper Owner Defendants and John Doe Defendant "1" operated the Supplier Defendant Enterprise, insofar as the Supplier Defendants never operated as a legitimate DME/OD provider, never were eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the Supplier Defendants to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a

threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Supplier Defendants to the present day.

300.    The Supplier Defendant Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by the Supplier Defendant Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

301.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $210,000.00 pursuant to the fraudulent bills submitted through the Supplier Defendant Enterprise.

302.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against the Paper Owner Defendants (Radyushina, Lineros, and Zhou)
and John Doe Defendants
(Violation of RICO, 18 U.S.C. § 1962(d))**

303.    GEICO incorporates, as though fully set forth herein, each and every allegation in this Complaint as if fully set forth at length herein.

304.    The Supplier Defendant Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

305.    The Paper Owner Defendants and the John Doe Defendants are employed by and/or associated with the Supplier Defendant Enterprise.

306.    The Paper Owner Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Supplier Defendant Enterprise's affairs through a pattern of racketeering activity consisting

of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the Supplier Defendant Enterprise was not eligible to receive under the No-Fault Laws because: (i) in every claim, the Supplier Defendants were not properly licensed as required by regulations from the City of New York because they knowingly falsified information on their applications for a Dealer in Products license or never obtained a Dealer in Products license; (ii) in every claim, the Supplier Defendants submitted bills to GEICO for DME/OD they purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (iii) in every claim, the Supplier Defendants submitted bills to GEICO for DME/OD they purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity; (iv) in many claims, to the extent that the Supplier Defendants actually provided DME/OD to Insureds, the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that the Supplier Defendants actually provided DME/OD to Insureds, the Fraudulent Equipment misrepresented the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment misrepresented the permissible reimbursement rate for the DME/OD provided. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibits "1" through "5".

307.    The Paper Owner Defendants and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

308.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $210,000.00.00 pursuant to the fraudulent bills submitted by Defendants through the Supplier Defendants.

309.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against Radyushina, Lineros and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

310.    GEICO incorporates, as though fully set forth herein, each and every allegation contained in this Complaint as if fully set forth at length herein.

311.    Surgut is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

312.    Radyushina, Lineros, and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Surgut's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that Surgut was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, Surgut was not properly licensed as required by regulations from the City of New York because they knowingly falsified information on their applications for a Dealer in Products license; (ii) in every claim, Surgut submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon

prescriptions obtained through unlawful financial arrangements; (iii) in every claim, Surgut submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity; (iv) in many claims, to the extent that Surgut actually provided DME/OD to Insureds, the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that Surgut actually provided DME/OD to Insureds, the Fraudulent Equipment misrepresented the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment misrepresented the permissible reimbursement rate for the DME/OD provided. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

313.    Surgut's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Radyushina, Lineros, and John Doe Defendant "1" operate Surgut, insofar as Surgut is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Surgut to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Radyushina, Lineros, and John Doe Defendant "1" continue to submit and attempt collection on the fraudulent billing submitted by Surgut to the present day.

314.    Surgut is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These

inherently unlawful acts are taken by Surgut in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

315.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $40,000.00 pursuant to the fraudulent bills submitted through Surgut.

316.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Surgut, Radyushina, Lineros, and John Doe Defendant "1"
### (Common Law Fraud)

317.     GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

318.     Surgut, Radyushina, Lineros, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

319.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Surgut had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Surgut was not lawfully licensed as they knowingly falsified the business owner information on their application for a Dealer in Products license; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financial enrich those that participated in the

scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment did not represent the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) the representation that the charges for Fraudulent Equipment were permissible when the charges exceeded the permissible reimbursement permitted under the No-Fault Laws.

320.    Surgut, Radyushina, Lineros, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Surgut that were not compensable under the No-Fault Laws.

321.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $40,000.00 pursuant to the fraudulent bills submitted by Surgut, Radyushina, Lineros, and John Doe Defendant "1".

322.    Surgut, Radyushina, Lineros, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

323.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
**Against Surgut, Radyushina, Lineros, and John Doe Defendant "1"**
**(Unjust Enrichment)**

324.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

325.    As set forth above, Surgut, Radyushina, Lineros, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

326.    When GEICO paid the bills and charges submitted by or on behalf of Surgut for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Surgut, Radyushina, Lineros, and John Doe Defendant "1"'s improper, unlawful, and/or unjust acts.

327.    Surgut, Radyushina, Lineros, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Surgut, Radyushina, Lineros, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

328.    The retention of GEICO's payments by Surgut, Radyushina, Lineros, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

329.    By reason of the above, Surgut, Radyushina, Lineros, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $40,000.00.

## SEVENTH CAUSE OF ACTION
**Against Radyushina and John Doe Defendant "1"**

**(Violation of RICO, 18 U.S.C. § 1962(c))**

330.    GEICO incorporates, as though fully set forth herein, each and every allegation contained in this Complaint as if fully set forth at length herein.

331.    RVA is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

332.    Radyushina and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of RVA's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that RVA was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, RVA was not properly licensed as required by regulations from the City of New York because they knowingly falsified information on their applications for a Dealer in Products license; (ii) in every claim, RVA submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (iii) in every claim, RVA submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity; (iv) in many claims, to the extent that RVA actually provided DME/OD to Insureds, the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that RVA actually provided DME/OD to Insureds, the Fraudulent Equipment misrepresented the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment misrepresented the permissible

reimbursement rate for the DME/OD provided. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

333.    RVA's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Radyushina and John Doe Defendant "1" operate RVA, insofar as RVA is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for RVA to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Radyushina and John Doe Defendant "1" continue to submit and attempt collection on the fraudulent billing submitted by RVA to the present day.

334.    RVA is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by RVA in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

335.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $31,000.00 pursuant to the fraudulent bills submitted through RVA.

336.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**Against RVA, Radyushina, and John Doe Defendant "1"**

**(Common Law Fraud)**

337.    GEICO incorporates, as though fully set forth herein, each and every allegation contained in this Complaint as if fully set forth at length herein.

338.    RVA, Radyushina, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

339.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that RVA had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact RVA was not lawfully licensed as they knowingly falsified the business owner information on their application for a Dealer in Products license; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financial enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment did not represent the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) the representation

that the charges for Fraudulent Equipment were permissible when the charges exceeded the permissible reimbursement permitted under the No-Fault Laws.

340.    RVA, Radyushina, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through RVA that were not compensable under the No-Fault Laws.

341.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $31,000.00 pursuant to the fraudulent bills submitted by RVA, Radyushina, and John Doe Defendant "1".

342.    RVA, Radyushina, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

343.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against RVA, Radyushina, and John Doe Defendant "1"
### (Unjust Enrichment)

344.    GEICO incorporates, as though fully set forth herein, each and every allegation contained in this Complaint as if fully set forth at length herein.

345.    As set forth above, RVA, Radyushina, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

346.    When GEICO paid the bills and charges submitted by or on behalf of RVA for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the RVA, Radyushina, and John Doe Defendant "1"'s improper, unlawful, and/or unjust acts.

347.    RVA, Radyushina, and John Doe Defendants "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that RVA, Radyushina, and John Doe Defendants "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

348.    RVA, Radyushina, and John Doe Defendants "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

349.    By reason of the above, RVA, Radyushina, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $31,000.00.

**TENTH CAUSE OF ACTION**
**Against Radyushina and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

350.    GEICO incorporates, as though fully set forth herein, each and every allegation contained in this Complaint as if fully set forth at length herein.

351.    Drak is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

352.    Radyushina and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Drak's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that Drak was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, Drak was not properly licensed as required

by regulations from the City of New York because they knowingly falsified information on their applications for a Dealer in Products license; (ii) in every claim, Drak submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (iii) in every claim, Drak submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity; (iv) in many claims, to the extent that Drak actually provided DME/OD to Insureds, the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that Drak actually provided DME/OD to Insureds, the Fraudulent Equipment misrepresented the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment misrepresented the permissible reimbursement rate for the DME/OD provided. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

353.   Drak's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Radyushina and John Doe Defendant "1" operate Drak, insofar as Drak is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Drak to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the

Paper Owner Defendants and John Doe Defendant "1" continue to submit and attempt collection on the fraudulent billing submitted by Drak to the present day.

354.    Drak is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Drak in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

355.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $128,000.00 pursuant to the fraudulent bills submitted through Drak.

356.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
**Against Drak, Radyushina, and John Doe Defendants "1"**
**(Common Law Fraud)**

357.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

358.    Drak, the Paper Owner Defendants, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

359.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Drak had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Drak was not lawfully licensed as they knowingly

falsified the business owner information on their application for a Dealer in Products license; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financial enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment did not represent the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) the representation that the charges for Fraudulent Equipment were permissible when the charges exceeded the permissible reimbursement permitted under the No-Fault Laws.

360.    Drak, Radyushina, and John Doe Defendants "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Drak that were not compensable under the No-Fault Laws.

361.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $128,000.00 pursuant to the fraudulent bills submitted by Drak, Radyushina, and John Doe Defendant "1".

362.     Drak, Radyushina, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

363.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION
### Against Drak, Radyushina, and John Doe Defendant "1"
### (Unjust Enrichment)

364.     GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

365.     As set forth above, Drak, Radyushina, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

366.     When GEICO paid the bills and charges submitted by or on behalf of Drak for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Drak, Radyushina, and John Doe Defendant "1"'s improper, unlawful, and/or unjust acts.

367.     Drak, Radyushina, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Drak, Radyushina, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

368.     Drak, Radyushina, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

369.     By reason of the above, Drak, Radyushina, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $128,000.00.

## THIRTEENTH CAUSE OF ACTION
### Against Lineros and John Doe Defendant "1"
### (Violation of RICO, 18 U.S.C. § 1962(c))

370.    GEICO incorporates, as though fully set forth herein, each and every allegation contained in this Complaint as if fully set forth at length herein.

371.    Taniyn is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

372.    Lineros and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Taniyn's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that Taniyn was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, Taniyn was not properly licensed as required by regulations from the City of New York because they knowingly falsified information on their applications for a Dealer in Products license; (ii) in every claim, Taniyn submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (iii) in every claim, Taniyn submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity; (iv) in many claims, to the extent that Taniyn actually provided DME/OD to Insureds, the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that Taniyn actually provided DME/OD to Insureds, the Fraudulent Equipment misrepresented the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the

extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment misrepresented the permissible reimbursement rate for the DME/OD provided. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "4".

373.    Taniyn's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Lineros and John Doe Defendant "1" operate Taniyn, insofar as Taniyn is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Taniyn to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Lineros and John Doe Defendant "1" continue to submit and attempt collection on the fraudulent billing submitted by Taniyn to the present day.

374.    Taniyn is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Taniyn in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

375.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $7,000.00 pursuant to the fraudulent bills submitted through Taniyn.

376.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FOURTEENTH CAUSE OF ACTION
**Against Taniyn, Lineros, and John Doe Defendant "1"**
**(Common Law Fraud)**

377.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

378.    Taniyn, Lineros, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

379.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Taniyn had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Taniyn was not lawfully licensed as they knowingly falsified the business owner information on their application for a Dealer in Products license; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financial enrich those that participated in the scheme; (iii)  the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment did not represent the DME/OD provided because the equipment did not

meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) the representation that the charges for Fraudulent Equipment were permissible when the charges exceeded the permissible reimbursement permitted under the No-Fault Laws.

380.    Taniyn, Lineros, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Taniyn that were not compensable under the No-Fault Laws.

381.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $7,000.00 pursuant to the fraudulent bills submitted by Taniyn. Lineros, and John Doe Defendant "1".

382.    Taniyn, Lineros, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

383.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTEENTH CAUSE OF ACTION**
**Against Taniyn, Lineros, and John Doe Defendant "1"**
**(Unjust Enrichment)**

384.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

385.    As set forth above, Taniyn, Lineros, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

386.    When GEICO paid the bills and charges submitted by or on behalf of Taniyn for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Taniyn, Lineros, and John Doe Defendant "1"'s improper, unlawful, and/or unjust acts.

387.    Taniyn, Lineros, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Taniyn, Lineros, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

388.    Taniyn, Lineros, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

389.    By reason of the above, Taniyn, Lineros, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $7,000.00.

**SIXTEENTH CAUSE OF ACTION**
**Against Zhou and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

390.    GEICO incorporates, as though fully set forth herein, each and every allegation contained in this Complaint as if fully set forth at length herein.

391.    Tatsu is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

392.    Zhou and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Tatsu's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that Tatsu was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, Tatsu was not properly licensed as required

by regulations from the City of New York because they knowingly falsified information on their applications for a Dealer in Products license or never obtained a Dealer in Products license; (ii) in every claim, Tatsu submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (iii) in every claim, Tatsu submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity; (iv) in many claims, to the extent that Tatsu actually provided DME/OD to Insureds, the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that Tatsu actually provided DME/OD to Insureds, the Fraudulent Equipment misrepresented the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment misrepresented the permissible reimbursement rate for the DME/OD provided. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "5".

393.    Tatsu's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Zhou and John Doe Defendant "1" operate Tatsu, insofar as Tatsu is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Tatsu to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the

Sorokin and John Doe Defendant "1" continue to submit and attempt collection on the fraudulent billing submitted by Tatsu to the present day.

394.    Tatsu is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Tatsu in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

395.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $4,000.00 pursuant to the fraudulent bills submitted through Tatsu.

396.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper

**SEVENTEENTH CAUSE OF ACTION**
**Against Tatsu, Zhou, and John Doe Defendant "1"**
**(Common Law Fraud)**

397.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

398.    Tatsu, Zhou, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

399.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Tatsu had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Tatsu was not lawfully licensed as they knowingly

falsified the business owner information on their application for a Dealer in Products license; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financial enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment did not represent the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) the representation that the charges for Fraudulent Equipment were permissible when the charges exceeded the permissible reimbursement permitted under the No-Fault Laws.

400.    Tatsu, Zhou, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Tatsu that were not compensable under the No-Fault Laws.

401.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $4,000.00 pursuant to the fraudulent bills submitted by Tatsu, Zhou, and John Doe Defendant "1".

402.    Tatsu, Zhou, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

403.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## EIGHTEENTH CAUSE OF ACTION
### Against Tatsu, Zhou, and John Doe Defendant "1"
### (Unjust Enrichment)

404.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

405.    As set forth above, Tatsu, Zhou, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

406.    When GEICO paid the bills and charges submitted by or on behalf of Tatsu for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Tatsu, Zhou, and John Doe Defendant "1"'s improper, unlawful, and/or unjust acts.

407.    Tatsu, Zhou, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Tatsu, Zhou, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

408.    Tatsu, Zhou, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

409.    By reason of the above, Tatsu, Zhou, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $4,000.00.

**JURY DEMAND**

410.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against the Supplier Defendants (Surgut, RVA, Drak, Taniyn, and Tatsu), a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the Supplier Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of action against the Paper Owner Defendants and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $210,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against the Paper Owner Defendants and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $210,000.00 together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Radyushina and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $40,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.    On the Fifth Cause of Action against Surgut, Radyshina, and John Doe Defendant "1" compensatory damages in favor of GEICO in an amount to be determined at trial but in excess

of $40,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Surgut, Radyushina, and John Doe Defendant "1", more than $40,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against RVA, Radyushina, and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $31,000.00 together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against RVA, Radyushina, Mavashev, and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $31,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against RVA, Radyushina, Mavashev, and John Doe Defendant "1", more than $31,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Radyushina and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $128,000.00 together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.      On the Eleventh Cause of Action against Drak, Radyushina, and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial

but in excess of $128,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

L.    On the Twelfth Cause of Action against Drak, Radyushina, and John Doe Defendant "1", more than $128,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

M.    On the Thirteenth Cause of Action against Lineros and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $7,000.00 together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.    On the Fourteenth Cause of Action against Taniyn, Lineros, and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $7,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.    On the Fifteenth Cause of Action against Taniyn, Lineros, and John Doe Defendant "1", more than $7,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

P.    On the Sixteenth Cause of Action against Zhou and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $4,000.00 together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Q.    On the Seventeenth Cause of Action against Tatsu, Zhou, and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess

of $4,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

   R. On the Eighteenth Cause of Action against Tatsu, Zhou, and John Doe Defendant "1", more than $4,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: October 10, 2024
   Uniondale, New York

       RIVKIN RADLER LLP


       By: */s/ Barry I. Levy*
        Barry I. Levy, Esq.
        Michael A. Sirignano, Esq.
        Michael Vanunu, Esq.
        Alexandra Wolff, Esq.
       926 RXR Plaza
       Uniondale, New York 11556
       (516) 357-3000

       *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*